[L. A. No. 7460. In Bank.—July 27, 1923.]

In the Matter of the Estate of EVALINE BRYSON, Deceased. JOHN BRYSON ASHBY, Appellant, v. ISAAC H. BRYSON et al., Respondents.

[1] ESTATES OF DECEASED PERSONS — WILL CONTEST—UNDUE INFLUENCE—NONSUIT—EVIDENCE.—In this will contest, based upon alleged undue influence, it is held that under the rules of construction that apply in cases of nonsuit, by indulging every favorable inference fairly deducible and every favorable presumption fairly arising from the evidence, and giving to contestant the benefit of

every piece of evidence which tends to sustain his' averments, he completely failed to make out a *prima facie* case and a nonsuit was properly granted.

[2] ID.—FRAUD—PRESUMPTIONS.—The rule of law is that fraud must be proved and cannot be presumed.

[3] ID.—EVIDENCE—SUBMISSION OF QUESTION OF FACT.—To justify the submission of any question of fact to a court or jury there must be proof of a substantial character that the fact is as alleged.

[4] ID. — UNDUE INFLUENCE — INFLUENCE ON MIND OF TESTATOR — PROOF.—In order to establish that a will has been executed under undue influence, it is necessary to show, not only that such influence has been exercised, but also that it has produced an effect upon the mind of the testator by which the will which he executes is not the expression of his own desire, and the presumption of undue influence is not raised by proof of interest and opportunity alone.

APPEAL from a judgment of the Superior Court of Los Angeles County. James C. Rives, Judge. Affirmed.

The facts are stated in the opinion of the court.

Newby & Palmer for Appellant.

Ingall W. Bull, Henry T. Gage and Harold Larson for Respondents.

SEAWELL, J.—At the close of appellant's case respondents moved for a nonsuit, which motion was granted. The appeal is from the judgment entered thereon.

Evaline Bryson died testate on or about June 17, 1920, in the county of Los Angeles, a resident of said county, this state, leaving personal and real property of the value of about $91,000. Decedent's will was executed November 1, 1909.. Two codicils, the first of which was dated February 22, 1915, and the second April 2, 1915, were executed. All of the children living, and the representatives of deceased children of the marriage of John Bryson, Sr., and Evaline Bryson, were made beneficiaries under the provisions of said will. Evaline Bryson survived her husband by several years.

---

4. Effect of unnatural testamentary disposition on question of undue influence, notes, 7 Ann. Cas. 894; 6 L. R. A. (N. S.) 202; 22 L. R. A. (N. S.) 1024.

The Bryson Block, a very valuable piece of property, situate in the city of Los Angeles, and acquired a number of years prior to the execution of said will, was the principal source of the elder Bryson's wealth, and the accumulated earnings therefrom constitute the greater portion of decedent's estate, the distribution of which is contested.

Isaac H. Bryson and John Henry Bryson, son and nephew respectively of decedent, were named in said will executors without bonds. They filed a petition praying that said will and codicils be admitted to probate and that letters testamentary be issued to them. Objections and a contest to the probate thereof were filed by John Bryson Ashby, a grandson, July 20, 1920, alleging that the will and codicils are the products of undue influence exercised and brought to bear upon the mind of decedent by her son, Isaac H. Bryson. The facts specifically alleged by contestant are that decedent was unfamiliar with business affairs and for a period of twenty years prior to her death by reason of her advanced years she had been and continued until her death to be weak in body and mind, unable to transact business or care for her property, and that she was in constant need of personal care and attention; that during all of said period she resided with and was cared for by her son, Isaac H. Bryson, at decedent's home, and was entirely dependent upon him for care and attention; that by reason of her advanced years, lack of business experience, and also by reason of her dependency upon her said son for care and attention said son acquired and had at the time of the formal execution of said will and codicils a great and controlling influence over her mind and will and was able thereby to, and did direct and dictate to her in matters relative to her property; that said Isaac H. Bryson possessed, and for many years prior to the execution of said will and codicils possessed, a most violent temper and at many times prior to, and about the time of the execution of said will and codicils, displayed in the presence of testratrix fits of anger when she did anything that displeased him, and he raved at and scolded decedent to the extent that she was in fear and dread of his wrath; that while she was in the condition of body and mind described and under the domination and control of her said son, he, with the intent and for the purpose of procuring the said Evaline Bryson to execute said purported will

and codicils and for the purpose of "taking an undue and
unfair advantage of her said condition and of his domina-
tion and control of her, as aforesaid, and taking a grossly
oppressive and unfair advantage of her necessities and dis-
tress of mind and body, at, and many times before the time
of the formal execution of said purported will, . . . and
codicils, did present to the said Evaline Bryson papers and
documents for her signature and did not read or explain
to said decedent what the documents were, and said decedent
had confidence in and depended entirely upon her said son,
Isaac H. Bryson, for the handling of and the transacting of
all her said business''; that said son stated to her that her
children were spendthrifts and could not preserve or care .
for any property which they might receive from her estate
and that they had no filial affection for her but were anx-
iously awaiting her death to obtain and squander her prop-
erty; that said son, Isaac H. Bryson, demanded of decedent
that "she should by codicils declare a complete settlement
with him [Isaac H. Bryson] and provide in said will a con-
dition of forfeiture if any of the heirs should attempt to
contest the same''; that by means of the statements and de-
mands hereinbefore set out said Isaac H. Bryson prevailed
upon said decedent while she was in said weakened condi-
tion and so under his domination and control as to be unable
to resist his influence upon her, both at the time of the exe-
cution of said will and said codicils, and did thereby influ-
ence her against her will and wishes to execute in form said
purported will and codicils; that all of said statements made
by said Isaac H. Bryson to influence said decedent were un-
true and were known by said Isaac H. Bryson to be untrue
at the time the same were made and were intended to and
did prejudice testatrix against her children and grandchil-
dren; that by reason of her weakened mental and bodily con-
ditions she was unable to resist said undue influence of said
Isaac H. Bryson and that said will and codicils are the
product of said undue influence; that had she been free
from said undue influence she would not have executed said
will and codicils or either.

As a second ground of contest it is alleged that many
years prior to the execution of the will or codicils said Isaac
H. Bryson had complete control of all the business affairs
of decedent and controlled her property and money as his

own and so great was her confidence in him that she signed papers and documents prepared or caused to be prepared by him without reading them or knowing the contents thereof; that for the ten years preceding her death she kept no account of her property and at the time of the execution of said codicils she did not know what property stood in her name; that on the tenth day of February, 1915, with the intention of defrauding said decedent he caused her to convey by grant deed to him, Isaac H. Bryson, and to Susan E. Bryson, his wife, as joint tenants, certain described Kern County lands; that since 1907 large sums of money belonging to said Evaline Bryson came into the hands of said Isaac H. Bryson as her agent, which moneys were handled and controlled by him for her; that the said Evaline Bryson depended upon and trusted the said Isaac H. Bryson in the handling thereof; that if the said Evaline Bryson had known the facts about her money and property and the amount expended by the said Isaac H. Bryson she would not have executed the codicil declaring a full settlement with him; that it was because of a lack of knowledge in this respect that she was induced by the said Isaac H. Bryson to declare a full settlement with him and to declare an exoneration of the moneys and property used and held by him, and she was thereby influenced to declare in her said codicil that he was the owner of the real estate heretofore referred to; that believing and relying upon said Isaac H. Bryson in the handling of said property and believing that said property would be accounted for she was induced to execute the said purported codicil which she would not have done had she known the real facts concerning her property.

All of the material allegations laid as a basis for the charges of undue influence, or which may be claimed to show mental weakness, are specifically denied. It is admitted by petitioners that since about the year 1907, in obedience to the earnest request and wish of Evaline Bryson, her said son, Isaac H. Bryson, took up his residence with her and thereafter resided continuously at her home in the city of Los Angeles until her death and gave her all proper care and attention of which she was in need and which he as a dutiful son should have given, but it is denied that she at any time entirely depended upon him solely because of the care and attention he gave her as a son; it is also ad-

mitted that Evaline Bryson had confidence in said Isaac H.
Bryson during the time he was handling and transacting all
of her business which she voluntarily entrusted to his care,
but it is alleged that she at all times did receive from him
proper accounts and reports of all business handled or trans-
acted by him and that she personally examined said reports
and accounts and approved the same when correct and that
she was at all times mentally capable of doing so. It is
denied that Isaac H. Bryson had control of her property or
that she signed papers or documents without a knowledge
of the contents thereof. It is affirmatively alleged that she
was at all times acting freely and voluntarily in all matters
of business and otherwise and that at the time of the execu-
tion of said will and codicils she was of sound and disposing
mind and memory, free from duress, menace, undue influ-
ence, or deceit of any kind whatsoever.

Testatrix by her will gave to her daughter, Margaret Jane
Krause, mother of contestant, the piano then at the home of
the latter and all jewelry she should own at the time of her
death; to Nettie E. Bryson, widow of her deceased son, Will-
iam, she gave $2,000. In the event of her death this bequest
was to be distributed to the other legatees in equal shares.
To her sons, Isaac H., John M., James F., and to her daugh-
ter, Margaret Jane Krause, and to Nettie E. Bryson, widow
of her deceased son, Edward Bryson, and to Alice Bryson,
widow of her deceased son, Albert F. Bryson, she gave an
undivided one-sixth interest in the piano and all the furni-
ture which she should own at the time of her death. Upon
the death of Isaac H. Bryson, his wife, Susan E. Bryson,
was to succeed to his one-sixth interest in said furniture.
Any disagreements between said heirs as to the selection
of the particular articles or pieces of furniture was to be
overcome by the sale of such particular piece or pieces in
disagreement and the proceeds were to be divided propor-
tionately among said heirs. All existing notes, accounts,
and debts, with legal interest due thereon, owing to her by
any of her beneficiaries, whether barred or not by the stat-
ute of limitations, were to be treated as advancements made
to said beneficiaries respectively and deducted from his or
her share of decedent's estate. The executors were in-
structed not to sue for the collection of said indebtedness
but to inventory the same and cause the proper deductions

to be made from the distributive share of such beneficiary as may be shown to be her debtors and not expressly released from their obligation. Specific instructions were given that the indebtedness of Margaret J. Krause should be deducted from her share. This indebtedness was evidenced by two promissory notes, one of which was dated August 15, 1905, and was given for the payment of the sum of $1,410, signed by Margaret J. Krause and O. W. Krause; the other bore date June 2, 1902, and was for the payment of a note in the sum of $1,705, executed by John B. Ashby, contestant herein, and his mother, Margaret Jane Krause. The will declares that all of testatrix's heirs had been theretofore provided for by a deed and trust agreement executed by her and her predeceased husband, John Bryson, Sr., by the terms of which the remainder in fee of a very valuable piece of property situate in the city of Los Angeles, known as the Bryson Block, was conveyed to the Bryson Estate Company, a corporation, for the benefit of said heirs subject to certain trusts. John Bryson, Sr., had some time prior to the incorporation of said trust estate company and prior to the execution of said will executed a mortgage upon his undivided one-half interest in said property to the Title Trust & Guaranty Company, a corporation, of the city of Los Angeles, as security for the payment of $25,000, which principal sum was still unpaid at the time the will was executed. Apprehensive that said heirs would be unwilling or unable to discharge this mortgage indebtedness at maturity and to the end that said Bryson Block might be preserved to her said heirs and to prevent the foreclosure of said mortgage, she bequeathed and devised to her executors herein, in trust, the rest, residue, and remainder of her estate with full power to collect, receive, and accumulate all the rents and profits of said property and to pay from the net income of said property the balance of the principal and interest as may become due upon the maturity of said note and mortgage given by John Bryson, Sr., to said Title Trust & Guaranty Company, with full authority to pay the note and to discharge the mortgage in such manner as they may deem fit and proper. Subject to said trust created by will, and, in the event of its failure or termination, said testatrix devised and bequeathed all the rest, residue, and remainder of her estate to the heirs above named in undivided one-

sixth interests. In the event of the death of Isaac H. his wife was to succeed to his interest. Mrs. Nettie E. Bryson, widow of a deceased son, was to enjoy her interest during widowhood, the remainder upon remarriage or death to vest in her two children. All other devises or bequests were absolute. In the event that said mortgage was fully paid before the close of the administration of her estate the income from said Bryson Block was to be equally divided and be payable monthly to said heirs. Testatrix declared that her son, Isaac H., named as one of the executors of her will was not indebted to her in any sum whatever and she expressly stated that she did not wish, in any event, that any deduction should be made from his share on account of any claim or any pretended advancement made to him.

Clause "Seventh" of said will provides that in order to guard against waste and willful or negligent expense to her estate caused by litigation, and to the end that the beneficiaries named in her will who are satisfied to abide by its provisions may receive their respective allotted shares undiminished by the expense caused by dissatisfied heirs or legatees, each devise and bequest is made subject to the provisions of said clause "Seventh," which in effect provides that should any of said heirs, legatees, or devisees or any of their heirs or descendants entitled to succeed to his or her share under said will, individually or jointly, bring, instigate, or maintain any contest or court proceedings for the revocation of or against the probate of said will or who shall refuse to abide by all or any of its provisions, such heir, devisee, or legatee shall bear the costs, expenses, charges, and attorneys' fees which said estate may incur in the defense of said contest or opposition should the same prove unsuccessful, and the executors are authorized and directed to deduct said costs of defense, including attorneys' fees, from the distributive share or shares of such heir or heirs as should contest.

Said Isaac H. Bryson and John Henry Bryson, named executors without bonds, are authorized to sell, mortgage, or lease any or all of decedent's property, real, personal, or mixed, without being first required to obtain an order of court so to do or to file any petition therefor, and are empowered to make sales, mortgages, or leases in such man-

ner as may seem to them to be for the best interests of said estate.

On February 22, 1915, decedent executed a codicil to said will whereby she revoked the legacy giving to Margaret Jane Krause all of the jewelry which she might own at the time of her death. She explained that this change was made necessary for the reason that since the execution of said will she had made presents of diamonds and valuable jewelry to certain of her children and only trinkets and inconsequential pieces of jewelry such as she might own at the time of her death were to be distributed to said heirs on the same terms as were prescribed for the distribution of her furniture. It was also provided that the following gifts should not be treated as advancements: The house and lot situate at Tropico, county of Los Angeles, deeded to John F. Bryson; the house and lot being No. 158, South Oxford Avenue, Los Angeles City, granted to John M. Bryson; certain land situate in Kern County granted to Isaac H. Bryson and wife. It was also expressly directed that the bequests of $25,000 theretofore given to each of her children then living (including the mother of contestant) and to the wives of deceased sons should not be deemed advancements. Clause "Seventh" of said will was modified so as to provide that should any heir, devisee, or legatee under said will, maintain, instigate, and contest or bring any action for the revocation thereof, individually or jointly, such heir or heirs should not share in her estate and the share of such contestant shall be distributed ratably to the residuary devisees and legatees who had taken no part in instigating or conducting such contest or litigation. It is provided, *ex industria,* that in the event that the children of Margaret Jane Krause *and* Alice Bryson shall bring any action or contest or claim against her estate the provisions made by her will for the said Margaret Jane Krause and Alice Bryson shall fail and the share of each shall be ratably apportioned among such remaining residuary legatees and devisees as shall not take part in or instigate such contest or opposition. The legacy of $2,000 made to Nettie E. Bryson was withdrawn by the codicil for the reason that substantial advancements had been made to her since the execution of said will.

All of the devises and bequests were made subject to the forfeiture clause. On this subject the testatrix made the

191 Cal.—34

following observations: "Said provisions made for my said beneficiaries are conditioned upon their acceptance without question of these my last wishes, and are especially subject to this [forfeiture] clause. During my life I have treated all of my relatives affectionately and as fairly and justly as my best judgment permitted, and I have often made not altogether slight sacrifices for many of them, and if my trust in their sense of duty and gratitude shall be disappointed by unseemly and troublesome litigation after my death, I desire that my executors shall enforce this provision to the fullest extent according to law. My abiding faith in God bids me hope, however, that each and all of my heirs, legatees and devisees, and their children, will respect my judgment, name and memory by abstaining from selfish litigation over the small residue left of my estate in consideration of my liberal allowances and benefactions during my long, but not always, happy life."

The only change or modification made to the will by the second codicil consisted in the transfer of the share given to John M. Bryson to his son, Frank Bryson. The cause for this change was the death of John M. Bryson, occurring since the execution of the codicil dated February 22, 1915.

The pleadings are set out at considerable length for the purpose of showing the character of the acts, circumstances, relations, and transactions from which it is claimed the web of undue influence was woven. The allegations of the petition are somewhat vague, and in some instances the allegations of fact relied upon to establish a ground of contest on a particular theory conflict with and are repugnant to the statement of facts essential to and elsewhere pleaded for the purpose of establishing a different theory. The provisions of the will are also set out at large, as they furnish the best answer that may be made to contestant's charges of undue influence. There is nothing about the will or its codicils that suggests the indulgence of unreasonable preferences made in favor of one heir over another or an unfair or inequitable distribution of testatrix's estate among her children then living and the representatives of those deceased. If the proponent, Isaac H. Bryson, attempted to unduly influence testatrix in the disposal of her property his efforts for some reason were rendered futile and his plans signally miscarried. The contestant was but a grand-

child and, so far as the record shows, had no reason to expect that he would be made the object of her bounty. In 1902 he borrowed from her, as evidenced by a promissory note executed by himself and his mother, the sum of $1,705, which he never paid, and it was this indebtedness that testatrix in her will provided should be treated as an advancement made to contestant's mother and deducted, together with another note made jointly by her and C. W. Krause, from her share of the estate. There is no evidence in the record showing that he held any deep affection for her or that he was exceptionally considerate of her pleasure and happiness. The record does show, however, that until 1913 he frequently importuned his grandmother for moneys and property on behalf of himself and his mother. From the year 1913 to the year of her death—a period of seven years —he paid but two or three visits to the home of the testatrix. The principal basis of contestant's claim, as we gather it from the record, is to be found in the fact that his own and his mother's indebtedness, amounting to $3,115, was not forgiven by testatrix. Another cause of grievance arises from the fact that the testatrix did not give his mother, Margaret Jane Krause, a home, inasmuch as she had given homes to three or four of the children. There can be no possible doubt but that Mrs. Krause was attentively cared for by her mother, who seems to have made frequent contributions of money to her and was at all times solicitous of her comfort. Besides, Mrs. Krause lived on her mother's property for a considerable portion of time, visited her house frequently, received gifts of jewelry and diamonds, and was treated by testatrix in a fair and generous manner. This appears not only from the evidence, but also from the observations made by testatrix as set forth in her will and which stand undenied. Mrs. Krause had received, as had each of the children, a gift of $25,000 in cash. By the will she shared equally with the balance in all the property that testatrix left. She was called upon, however, to pay from her legacy the debts that she and contestant justly owed the estate. This requirement on the part of testatrix seems to constitute, so far as contestant is concerned, the real "head and front of her offending." Neither contestant nor his mother contributed especially to, or aided in the accumulation of the estate which contestant would now have distrib-

uted in a manner contrary to the wishes of testatrix. She, better than anyone else, knew of the many benevolences she had bestowed upon each of her children and the justice of the situation which should direct her course. Running through the whole case may be traced the thread of suspicion that Isaac H. Bryson took a dishonest advantage of the confidence that was reposed in him. His mother unquestionably had abiding faith in his integrity and his business judgment. In 1907 he displaced as manager of the Bryson Block a brother whose management had been very unsatisfactory. He was also made vice-president of the Bryson Estate Company, of which his mother was president. He held her general power of attorney and transacted practically all her business. From 1907 until her death he and his wife resided at her home. For a time he paid for himself and wife $70 a month as board and also contributed toward supplying household provisions. Full and complete reports of the receipts and disbursements in the management of the Bryson Block and the business transacted for his mother were made monthly. Books of account were kept in perfect shape and showed the full volume of business transacted in the management of said Bryson estate, as well as for and on behalf of the mother. The record does not contain one transaction that would justify the inference of dishonesty on his part. All funds were accounted for. While he and his wife were residing with testatrix other members of her family often visited the home, consulting and advising with testatrix as freely as they desired.

The directors of the Estate Company consisted of the members of testatrix's family—sons and daughters and in some instances wives of deceased sons, and grandchildren. They met in large numbers at testatrix's home to transact the business of the company. These meetings furnished the occasion not only for the discussion of business matters, but family affairs as well. On numerous occasions discord prevailed. Harsh accusations and bitter denunciations occasioned by jealousies, suspicions, and fears that Isaac H. Bryson or some one of the heirs had ingratiated himself or herself into the favor of the mother and was receiving more than an equal share of the estate, were not infrequently heard. Much anxiety was manifested by certain of the heirs as to whether or not testatrix had made a will and, if so,

the nature of its provisions. It was at these meetings that most all of the statements relied upon to sustain the charge of undue influence were made by Isaac H. Bryson. The statements charged against him were, no doubt, in some instances caused by provocative circumstances. In other instances they were made by way of disapproval of the personal conduct of some one of the heirs, or their descendants, or in resentment of an attempt on the part of certain heirs to frustrate some business policy advanced by him. All of the statements were made during open discussions, in a loud voice, in the presence of a number of the heirs, and were at no time made with the slightest regard of secrecy. It is not to be wondered at that such inartful and uncrafty methods as shown by the testimony should have failed to unduly influence, if such was the intent. It is contrary to the experience of life that a person moved by a design to unduly influence one to the hurt of others openly forewarns his intended victim of his purpose.

A few quotations from and references to the testimony will serve to illustrate the language used by Isaac H. Bryson to his mother and to other members of the family in her presence, upon which contestant relies very largely to make out a case of undue influence.

Mrs. Lillian Burns, a witness personally unfriendly to respondent Bryson, who had resided at testatrix's house for a short time either in 1913 or 1916 (she was uncertain as to time), testified that she had heard respondent say to his mother concerning the visits made by other members of the family to the Bryson home, "What do you want them for—what are they coming here for? They want your money; they are always after your money," and the mother would reply, "Not necessarily." Isaac would say: "He didn't want them to come; he disliked them and they were not fit to associate with." He spoke of Ashby as a dishonest man; "he couldn't do anything that was right; he never did do anything that was right, honest and upright; he didn't wish him to come to the house." He also stated that he would be glad when the Bryson property should be sold for taxes; that it would be sold for taxes and that the young people would be through with it. He further said that the sooner "we get through with the property the sooner they will have less to fight about." Witness heard testatrix say that she

expected to give each one of her children a home. Isaac remarked to his mother that if she was not careful they would go to the poorhouse; that they were spending money carelessly.

Louise Gerstmann did the housework at the Bryson home from February, 1907, to February, 1918. During the first two or three years of her connection with the family she heard frequent conversations with Isaac and his mother. "I heard them talk about the will because you know they never had any secrets; they just told everything; everything was open; everybody knew what I know. They told me that Mrs. Krause was going to get the diamonds." The witness believed that it was in 1909 she heard them talking about the will. Mrs. Isaac Bryson told her that Mother Bryson had made a will. Isaac never talked with the witness about his business. She could not state what Isaac had said about the execution of the will. The making of the will was discussed at the table in the presence of company. She heard Mrs. Krause say that Mother Bryson had made a will. Isaac said that Mrs. Krause was to get the diamonds. "That is all [diamonds] I remember about that will. I don't know if there was any thing else in it." Isaac said the rest of the family would "go through with everything; they would spend everything." The witness stated that "there was always trouble among the relatives; somebody always done something or said something." There was always turmoil. She heard Isaac say that if it were not for him the mother would not have anything, as the others did not save and he saw to it that she had plenty of money. When the question was raised by Isaac about the selling of the Bryson Block there was a big "fuss." She heard him say that Mrs. Krause had received too much money already; that they had been supporting her right along. He also made the statement that contestant drank and that he was "just like his father." The witness said there were six or seven at the table at every meal. She heard Isaac denounce Mrs. Webber, Mrs. Krause's daughter. He was angry at other members of the family, but never at his mother. He was always kind to her. He did not want the other members of the family to visit so often. Mrs. Krause was given money by her mother; if she did not come to the house it was sent to her. Witness thought she

was given about five dollars per week. Witness heard Mrs. Krause complain to her mother that Mrs. Isaac Bryson knew the contents of her will and she, a daughter, should also know the provisions of her will. The mother said: "Maggie, Isaac will do the right thing." Testatrix also said that if it was not for Isaac she would not have anything; that she depended upon him because he was honest. She heard her say: "I hope Isaac will outlive me, for I wouldn't know what to do without him." She never knew his mother to oppose him.

Mrs. Alice Bryson Ashby, the wife of contestant, testified that she heard testatrix state to Mrs. Krause that she would do anything in the world for her but she could not give her money because Isaac would not let her have it; that he took care of her business. Mrs. Krause had commenced a suit against her father, John Bryson, Sr., which made Isaac very angry and he told contestant that if he did not have his mother withdraw the suit he did not want him or his wife to ever again speak to him; that "if he didn't have his mother withdraw the suit she wouldn't get a cent of father's or mother's money; we will have them cut out of the will without a dollar." This occurred in 1895.

Ella H. Fisher, a daughter of Jane Bryson, who resided in Colorado, visited testatrix in 1902. She had not been in the house more than two weeks before she had a "fuss" with Isaac. She took exception to the location of the home testatrix had purchased for witness' mother and father. This ended in angry words with Isaac who made reference to her in uncomplimentary terms.

Hattie Bryson, wife of James S. Bryson, testified that in 1910 testatrix said that she was going to give each of her children $5,000 with which to purchase a home. John had already received that amount and witness received $3,500 to pay on a home.

In 1913, Lillian Webber, contestant's sister, visited the Bryson home in company with her mother, Mrs. Krause, and asked testatrix if she intended to give her mother a home. Testatrix said: "You will have to ask Uncle Isaac." Isaac became angry "and told us both to get up and get out; he wasn't going to be annoyed by us." Testatrix said she was poor and had no money. Mrs. Webber replied by stating that testatrix was receiving $1,500 or $1,600 a month from

the Bryson Block. Testatrix said, "I haven't got it." The witness related a difficulty that occurred between her and Isaac concerning the release of a $6,000 mortgage made by Henry Bryson to testatrix. Isaac said the mortgage had not been released and witness said it had been satisfied, citing the page and book of the records. Isaac said he would rather see the beggars in the street have it than to have any of "you people get any of this money." He said the notes held against contestant and his mother would be paid all right; that they would be deducted from Mrs. Krause's interest in the estate.

Vernon H. Peck, a real estate agent, gave testimony to the effect that in the year 1915, while calling in a social way at the residence of testatrix she stated that she wanted to get a couple or three homes—one for Maggie, one for John and Lizzie, and she might want to get a third one. On his fourth call in respect to the matter she told him that she was disappointed, that Isaac would not let her buy anything because he said there was not any money. The purchase price of one of the houses submitted was $8,400. The witness had formerly been associated with contestant in a business way.

Joseph Sentman Bryson, a son of Samuel Albert Bryson, was asked by his grandmother to become a director of the Bryson Estate Company. He said that if he became a director he wanted it understood that he would not take orders from anyone. Isaac asked him why he would refuse to take orders from him. He said that he thought he was biased toward certain members of the family, and if elected a director, he would do what was just and right. Isaac said that taking orders from him was not worse than taking money from the company, as his father had done when he was agent for the Bryson building. This reference to an unpleasant subject caused testatrix to begin to cry and she said: "Yes, your father took money while he was agent of the Bryson building and Isaac can prove it." Witness was not elected a director, but Henry Bryson was elected to fill the vacancy. He had also heard Isaac speak many times of the $1,700 that John Ashby owed testatrix and had heard him use bad names when speaking about him. The witness, however, was elected a director of the Bryson Estate Company in 1909 and continued thereafter to serve with Isaac as such. He said that Isaac put all the motions that were voted on

at the directors' meetings. Isaac claimed that the property was depreciating in value and as there were many untenanted rooms he advocated dissolving the trust and giving each heir $10,000 for his or her interest. This was opposed by certain of the heirs. Upon the defeat of his plans he said: "All they are waiting for is for you to die to get your money and that the block might be sold for taxes." He also said the mother might have to go to the poorhouse and if the heirs received their money they would go through it in a short time. He had heard Isaac in conversation with his mother upon many occasions, as witness was in the habit of visiting the Bryson home almost daily and took part in the conversations. He had seen Isaac arise when anything displeased him and clench his fist and use profanity. Witness heard him say that John Bryson was a crook and a deadbeat. On one occasion as John Ashby was passing out of testatrix's house Isaac said: "There comes that God damn dead-beat all dressed up like a millionaire; if he would pay his bills he would not be able to dress that way."

John F. Bryson, son of testatrix, repeated very largely the testimony already given. He spoke of Isaac's dislike of Mrs. Krause and had heard him say that she was "no good" and disparaged her character. He also spoke very disapprovingly of John Ashby.

Several instances were related by members of the Bryson family showing what is claimed to have been outbursts of anger on the part of Isaac. No doubt those instances were related to show that they must have produced a coercive or terrorizing influence upon the mother's mind. The few exhibitions of temper described occurred at meetings of the family and were provoked in the discussion of business affairs. They also arose out of the resistance offered by Isaac to the efforts of certain heirs to obtain money or property from testatrix; or criticisms of his management of the estate, or were the effect of insinuations made affecting his honesty and motives. In no sense was the display of temper calculated to influence nor could it have had the effect of unduly influencing the mother to disinherit a single member of her family. She was by no means in fear of her son Isaac. Every witness who spoke on the subject admitted that he was always kind to her and never spoke in harsh

terms to her. The evidence has impressed us, as it did the trial judge, that he was a dutiful and affectionate son.

Much of the evidence introduced into the case would have been relevant in an action for an accounting—a theory on which a pleading was at one time framed—but was wholly immaterial to the issue of undue influence. A good part of it was directed to conversations had a long time after the execution of the will and codicils.

The suggestion that testatrix did not know that she owned property or what its value was or the kind and character of such property at any time during her life is an absurd contention in the face of the testimony and the statements of those who were importuning her for favors. It is true that she told real estate agents, who doubtless were using their best efforts to persuade her to purchase rather expensive homes for certain children, that Isaac had said there was no money, or that she told them she was poor. It is a fair and natural inference to be drawn from the history of the family transactions that testatrix made Isaac her business agent and attorney for the purpose of protecting herself from both the stress of importuning heirs and from the annoyances of business life. Testatrix was eighty-two years past at the time Isaac became her attorney and agent; she was eighty-four years of age when she executed her will; ninety when she executed the codicils, and ninety-five at the time of her death. Witnesses who had known her long and well and had seen her often in her later life wondered at her strength of mind. Henry T. Gage, a former Governor of this state, said of her: ''She was a woman of remarkably clear mind, a bright woman; remarkably bright for a woman of her years or not of her years.'' Witnesses to the execution of the will and codicils testified to the same effect. Louise Gerstmann, the lady in charge of her household affairs from 1907 to 1920, testified that ''she was the dearest old lady that ever was, and very patient. She seemed to be a sensible old lady; the dearest lady I ever knew.'' No attempt was made to show that her mind had weakened or become impaired under the weight of years. Physically she grew more or less feeble, but her mental powers were not questioned by a single witness. She took occasional distant trips, rode a great deal in her automobile, discussed all her business affairs with her son Isaac, as testified to by Louise

Gerstmann, and was mentally alert. That she took pains to
husband her strength and protect herself against embar-
rassing and annoying situations is additional evidence of a
sound mental condition.

The transaction in which testatrix deeded 400 acres of Kern
County land, acquired in 1914 by an exchange of properties,
to Isaac, is offered as a circumstance pointing to undue influ-
ence. The value of the land is not shown and we conclude
that it was not of great value. The uncontradicted evidence
is that Isaac did not want the land, told his mother that he
did not want it, but she said she wanted to give him a home,
as she had given homes to the other children. He afterward
deeded the largest part of this land to John Henry Bryson,
a nephew, for a home. This was done before testatrix's
death and it met with her approval.

The claims of contestant are thus answered: If Isaac
attempted to keep other members of the family from the
home of testatrix, he failed, for they came in large numbers;
if it was his will that the mother should refuse to give them
money or property while living, he suffered disappointment,
because she gave to each one of her children either personal
or valuable real property; if he attempted to influence her
unduly in her testamentary disposition, he again failed. The
will itself is indisputable evidence of a rational disposition
of her estate. That Isaac's indebtedness, if any, was for-
given, was a matter for the determination of testatrix and
no one else. Under the evidence it was not an unnatural
thing for her to have done.

Only two assignments of error are noticed in the briefs of
appellant. The first is on the ruling of the court sustaining
an objection to a question asked by appellant as appears
below:

"Q. Did you have a conversation with Evaline Bryson in
May, 1913, relative to her property? A. I did.

"Q. State to the court what was said."

An objection was made and sustained to the question. It
will be noted that the time fixed was eight years after the
execution of the will and two years after the execution of
the codicils. The reason assigned for the materiality of the
question was that "if decedent had fully known about her
property, the condition and amount thereof, she might have
executed another codicil to her will." We see no merit in

this contention. No claim is made of unsoundness of mind, and we can see no reason, in the light of the pleadings and the theory of the case, why the inquiry as to the sole issue of undue influence should have been directed to a remote subsequent period of time, rather than confined to a period at or near the time when the act complained of was consummated. The question presented in *Estate of Carson*, 184 Cal. 437 [17 A. L. R. 239, 194 Pac. 5], to which appellant directs our attention, bears no resemblance to the question or situation before us, and it is therefore passed with a mere reference.

The second assignment arises upon an objection raised to a question asked Joseph Smith, a subscribing witness to the will, under the following circumstances:

"Q. At that time [when she executed the will] was Mrs. Bryson acting of her own free will, not acting under duress, or undue influence, or fraud?

"Mr. Himrod: Just a moment. We object to that as calling for a conclusion of the witness.

"The Court: You may answer so far as you know.

"A. So far as I know she was acting freely.

"The Court: And not under undue influence?

"A. Not under undue influence.

"Mr. Bull: Q. Or fraud? A. Or fraud of anyone."

Counsel, in discussing this ruling in his brief, suggests that as the question of insanity was not involved, the opinion of a subscribing witness was not particularly material so far as the issues of the contest were concerned. If this is true, no harm was done. The witness, however, was closely examined on all that was done and said by testatrix at the time the will was executed, and no possible harm resulted from the ruling complained of.

[1] Adopting, as we must, the rules of construction that apply to cases of nonsuit, by indulging every favorable inference fairly deducible and every favorable presumption fairly arising from the evidence, and giving to contestant the benefit of every piece of evidence which tends to sustain his averments, as fully stated in *Berger* v. *Lane*, 190 Cal. 443 [213 Pac. 45], and cases cited, it is clear that he has completely failed to make out a *prima facie* case. [2] The rule of law is that fraud must be proved and cannot be presumed, and its application to the facts of this case is sufficient alone

to defeat contestant's case. The inferences and presumptions spoken of above must fall within the realm of rationality. There is nothing in contestant's case which amounts to more than mere conjecture, surmise, or suspicion. [3] To justify the submission of any question of fact to a court or jury there must be proof of a *substantial* character that the fact is as alleged. [4] "In order to establish that a will has been executed under undue influence, it is necessary to show, not only that such influence has been exercised, but also that it has produced an effect upon the mind of the testator by which the will which he executes is not the expression of his own desires." (*Estate of Calkins*, 112 Cal. 296 [44 Pac. 577].) "The presumption of undue influence is not raised by proof of interest and opportunity alone. In order to set aside a will for undue influence, there must be substantial proof of a pressure which overpowered the volition of the testator at the time the will was made." (*Estate of Langford*, 108 Cal. 608 [41 Pac. 701].) It may be stated that so far as opportunity is concerned, any one of the heirs of the testatrix had equal opportunity to visit with, consult, and advise with testatrix. We entertain no doubt that Isaac H. Bryson advised with his mother fully on both business and personal matters and on subjects affecting the present and future welfare of the family. This was not only his privilege but his duty. Unpleasant as well as pleasant matters were no doubt the subject of consideration. Proof to establish undue influence must be had of a pressure which overpowered the mind and bore down the volition of the testator at the very time the will was made. (*Estate of Carithers*, 156 Cal. 422 [105 Pac. 127].) It consists in the exercise of acts or conduct by which the mind of the testator is subjugated to the will of the person operating upon it, some means taken or employed which have the effect of overcoming the free agency of the testator and constraining him to make a disposition of his property contrary to and different from what he would have done had he been permitted to follow his own inclination or judgment. (*Estate of Kilborn*, 162 Cal. 11 [120 Pac. 762].) It is unnecessary to further multiply authorities.

The mind of testatrix was not held under subjugation by anyone. There cannot be the slightest doubt but that her will reflects the free and voluntary wish of a just mind.

There is little merit in this appeal to commend it to the consideration of an appellate tribunal. To hold that the acts and conduct described by the evidence are to be regarded by the law as sinister attempts to unduly influence a parent in the disposition of her estate would be to requite filial duty with punishment.

The judgment is affirmed.

Lennon, J., Waste, J., Kerrigan, J., and Lawlor, J., concurred.