[Civ. No. 8784. First Appellate District, Division One.—August 9, 1934.]

In the Matter of the Estate of MARY EASTON, Deceased. SAMUEL W. DIXON et al., Appellants, v. MARGARET ECKENROTH et al., Respondents.

Edwin L. Forster and Walker Peddicord for Appellants.

Robert McMahon, John P. Doran and Andrew F. Burke for Respondents.

KNIGHT, J.—This is an appeal by contestants from an order granting a new trial in a proceeding brought to set aside the will of Mary Easton, deceased.

The contest was based on several grounds, but during the trial all were dismissed except one based on allegations of undue influence; and upon that issue the jury found in favor of contestants. Thereafter on motion of the proponents of the will the trial court entered judgment in their favor, notwithstanding the verdict. Contestants appealed, and the order was reversed upon the ground that under section 629 of the Code of Civil Procedure, the making of a motion for a directed verdict during the trial of the action was a necessary prerequisite to the rendition of a judgment *non obstante veredicto*, and that no such motion had been made. Accordingly the trial court was directed to enter judgment upon the verdict, and thereafter to hear and determine such other and further proceedings as were necessary to a final disposition of the case. (*Estate of Easton,* 118 Cal. App. 659 [5 Pac. (2d) 635].) Five days after the *remittitur* was filed proponents filed notice of intention to move for a new trial, urging as grounds therefor: insufficiency of the evidence; that the verdict is against law; and

errors of law occurring at the trial and excepted to by the proponents. Following the hearing of the motion a minute order was entered, general in terms, reading: "Opposition to motion for new trial—Denied. Motion for a new trial granted." Contestants took this appeal therefrom, and after the appeal was briefed and argued, but before it was submitted for decision, proponents obtained from the trial court an *ex parte* order directing the entry *nunc pro tunc* of an order to the effect that proponents' motion for new trial had been granted upon the ground of insufficiency of evidence. Proponents then sought by way of motion for diminution of record to have said *nunc pro tunc* order made part of the record on this appeal, but the motion was denied (*Estate of Easton,* 136 Cal. App. 213 [28 Pac. (2d) 376]); consequently the original order from which the appeal was taken is controlling, and inasmuch as it did not specify, as ground for the making thereof, insufficiency of the evidence to justify the verdict, the presumption on this appeal is that it was not based on that ground (sec. 657, Code Civ. Proc.) ; furthermore, proponents make no attempt to sustain said order upon the ground of errors of law occurring during the trial. ■ The appeal is narrowed down, therefore, as appellants contend, to the single question of whether the verdict is against law; that is, whether the evidence as a whole, when considered most favorably to contestants, and resolving all conflicts therein in support of the verdict, measures up to the standard fixed by law for the setting aside of a will upon the ground of undue influence. We are of the opinion that it does not.

■ The legal principles to be used in determining whether a will is the product of undue influence are well settled by a continuous line of decisions. They are set forth in the *Estate of Morcel,* 162 Cal. 188 [121 Pac. 733] , *Estate of Bryson,* 191 Cal. 521 [217 Pac. 525] , *Estate of Perkins,* 195 Cal. 699 [235 Pac. 45], and several later cases hereinafter cited. As pointed out therein, the kind of influence that may be held to be undue influence warranting a repudiation of a will "must be such as in effect destroyed the testator's free agency, and substituted for his own another person's will" (*Estate of Motz,* 136 Cal. 558, 563 [69 Pac. 294]) ; and mere general influence, however strong or controlling, not brought to bear on the testamentary act, is

not enough; it must be influence used directly to procure the will, and must amount "to coercion destroying free agency on the part of the testator" (*Estate of Keegan*, 139 Cal. 123, 127 [72 Pac. 828]; *Estate of Fleming*, 199 Cal. 750 [251 Pac. 637]; *Estate of Holloway*, 195 Cal. 711 [235 Pac. 1012]). So, also, proof of mere opportunity to influence the mind of the testatrix, even though coupled with an interest or with a motive so to do, is insufficient. In order to warrant setting aside a will on this ground there must be substantial proof, direct or circumstantial, of a pressure which overpowers the volition of the testator and operates directly on the testamentary act. (*Estate of Graves*, 202 Cal. 258 [259 Pac. 935]; *In re Langford*, 108 Cal. 608 [41 Pac. 701]; *Estate of Morcel, supra*.) In other words, the influence must consist in the exercise of acts and conduct by which the mind of the testator is subjugated to the will of the person operating upon it, some means taken or employed which have the effect of overcoming the free agency of the testator and constraining him to make a disposition of his property contrary to his own desires and different from what he would have done had he been permitted to follow his own inclinations or judgment. (*Estate of Kilborn*, 162 Cal. 4 [120 Pac. 762]; *Estate of Bryson, supra; Estate of Perkins, supra; Estate of Relph*, 192 Cal. 451 [221 Pac. 361]; *Estate of Holloway, supra; Estate of Anderson*, 185 Cal. 700 [198 Pac. 407]; *Estate of Fleming, supra; In re Calkins*, 112 Cal. 296 [44 Pac. 577].) ▆ It is well settled also that "mere suspicion that undue influence *may* have been used is not sufficient to warrant the setting aside of a will on that ground". (*Estate of Morcel, supra; Estate of Keegan, supra*.) The evidence must do more than raise a suspicion. It must amount to proof, and such evidence has the force of proof only when the circumstances proved show a pressure overpowering the free agency and volition of the testator at the time the will was made. (*In re McDevitt*, 95 Cal. 17 [30 Pac. 101]; *In re Langford, supra; Estate of Morcel, supra*.) In restating the extent a contestant is required to go in order to nullify a will upon the ground of undue influence, the Supreme Court in the *Estate of Gleason*, 164 Cal. 756 [130 Pac. 872], said: "The unbroken rule in this state is that courts must refuse to set aside the solemnly executed will of a deceased person

upon the ground of undue influence unless there be proof of 'a pressure which overpowered the mind and bore down the volition of the testator at the very time the will was made'." (Citing a number of cases.)

The following are the essential, undisputed facts of the present case, as shown by the evidence: The testatrix, Mrs. Easton, died at the age of sixty-five years. She was a childless widow, and left surviving her as next of kin three brothers, Samuel, John and Joseph Dixon, and a sister, Mrs. Sarah Hartnett. The brothers are the contestants herein, and the sister and her two daughters, Lucy Hartnett and Mrs. Margaret Eckenroth, are the proponents of the will. Mrs. Easton was afflicted with cancer, from the effects of which she eventually died. Her husband died March 19, 1928. At that time Mrs. Easton moved into the home of her sister; and she lived there until the date of her death, July 17, 1929. After moving into her sister's home and during the latter part of June, 1928, she went to a hospital and submitted to an operation. It was apparently successful, and for some time thereafter she went about evidently much improved in health; but later she began to fail and for about three months before she died she was confined most of the time to her home. At the time of her husband's death she received $5,000 as the proceeds of a policy of insurance on his life, which sum afterwards became a part of her estate, the total value of which was approximately $15,000, including real estate of the estimated value of $1,000. The Dixon brothers and sisters were old residents of San Francisco and their relations with each other were always close and affectionate. During her married life Mrs. Easton lived in the vicinity of her sister's home, and for many years was a constant visitor there. During the day, while her husband was absent from home, Mrs. Easton would spend much of the time with her sister. Following the San Francisco fire in 1906 she and her husband lived with the Hartnetts for about five years, and for more than twenty years it was their custom to dine with the Hartnetts every Sunday evening. The brothers, too, lived near Mrs. Easton and visited her very frequently. The Hartnett home into which Mrs. Easton moved following her husband's death contained three flats. Mrs. Hartnett, her daughter Lucy, and for a while a son, lived in the lower flat. Mrs. Ecken-

roth and her husband lived in the middle flat, and the upper was unoccupied. Mrs. Easton slept in a room with her sister; and for the board and accommodations she received she paid her sister $12.50 a week. The brothers continued to visit the testatrix regularly at the Hartnett home, Samuel having called about once a week, and Joseph approximately four times a week. Soon after receiving the insurance money Mrs. Easton deposited substantially all of it in a joint bank account which she opened in the names of herself and Lucy Hartnett at the latter's bank a few blocks distant from the Hartnett home. Lucy Hartnett accompanied her to the bank and was present when the account was opened and the money deposited. In June, 1928, when Mrs. Easton decided to undergo an operation, one of her brothers suggested that before doing so she should have her property affairs attended to. She discussed the matter with Lucy Hartnett, but what was said in this respect was not shown; and on June 17, 1928, accompanied by Lucy, she visited the same bank for the purpose of making a will. The instructions as to its provisions were given by Mrs. Easton, personally. Lucy Hartnett was present at the time, but said nothing. The next day, again accompanied by Lucy, Mrs. Easton returned to the bank and executed the will. It was attested by two attaches of the bank. By the terms of the will she declared that her sister Mrs. Hartnett was her "nearest living relative". She then bequeathed her personal effects and jewelry to her nieces, Lucy Hartnett and Mrs. Eckenroth, and the remainder of her estate in equal shares to her sister, Mrs. Hartnett, and her two nieces, with the right of survivorship. The brothers were not mentioned. The bank was named executor, and in this connection she stated that as soon as she returned from the hospital she intended to make another will so as to save the expense of executor's fees. After leaving the hospital and having apparently regained good health, she requested her niece Lucy Hartnett to arrange an appointment with a certain attorney whom Mrs. Easton had known for many years, for the purpose of having a new will drawn. There is no suggestion made that said attorney ever acted for any of the beneficiaries under the will or that they were intimately acquainted with him. Lucy made the appointment as re-

quested, accompanied her aunt to the attorney's office, and was present during the conversation between Mrs. Easton and the attorney. Mrs. Easton again personally gave the directions as to the provisions of the will she desired to make. In doing so she handed the attorney a copy of the will drawn at the bank and instructed him to prepare the new will in all respects similar thereto, except that she wanted her two nieces, Lucy Hartnett and Margaret Eckenroth, to be named as executrices instead of the bank. The reason she gave therefor was that she wanted to relieve the estate of the payment of any executor's fees. The attorney fixed a time for the return of Mrs. Easton to execute the will. She arrived at the appointed time, accompanied by her niece, Margaret Eckenroth, and the attorney handed Mrs. Easton the document prepared by him. She read it carefully and stated that it was drawn in accordance with her desires; whereupon she executed the same in the presence of the attorney and his office stenographer, who acted as subscribing witnesses. Margaret Eckenroth was present during all of this time, but did not participate in any of the conversation carried on there, nor make any statements whatever regarding the subject matter of the will. Mrs. Easton afterwards handed the will to Lucy Hartnett with the request that she keep it in her safe deposit box at the bank, which she did; and it remained there until after the death of her aunt. This second will was executed September 18, 1928, three months subsequent to the signing of the first will, and ten months before the testatrix died.

It is our opinion that the foregoing facts fail as a matter of law, under the decisions above cited, to establish a case of undue influence, as that term has been defined and construed in those decisions, for the reason that no act or declaration is disclosed tending to show the exercise or attempted exercise of any pressure whatever by any of the beneficiaries to overcome the free agency or volition of the testatrix, or which constrained her to dispose of her estate in any manner contrary to her own inclination or judgment. Contestants have not pointed out any such testimony, nor have we been able to find any. Nor is there any testimony to show that any person at any time ever made any suggestion to the testatrix or in her presence as to how she

should dispose of her estate; consequently there is a total absence of evidence tending to show even an attempted exercise of general influence. Nor was there any evidence introduced indicating that the testatrix was at any time suffering from a weakened mental condition from which it might be inferred that she was susceptible to subversion of freedom of will. On the contrary, as will be seen, the evidence shows without conflict the exercise on the part of the testatrix of the utmost freedom of thought and action.

Contestants call attention to certain testimony given by the wife of Joseph Dixon to the effect that the testatrix stated, after moving into the Hartnett home, that she had no privacy; that she referred to the home as "a crazy house", and stated that it made her nervous and "accounted for her condition". But it cannot be said that there is the slightest implication in any of these statements to justify the inference that any influence whatever was being exerted by anyone to have her do something against her judgment or desires; and obviously the remarks had reference to the restricted accommodations of the Hartnett home, as compared with the home previously occupied by herself and husband. Testimony was given also by two of the contestants to the effect that while visiting the testatrix at the Hartnett home they were never able to see her alone; that some member of the Hartnett family was always present. It does not appear, however, that they ever asked to see the testatrix alone, and it affirmatively appears that the members of the Hartnett family never denied them the privilege of doing so; furthermore, the evidence shows that before and after the making of each will and before the testatrix was confined to the house during the three months preceding her death, she was in fact alone with contestants and the members of their families on numerous occasions. She visited their homes and attended the theater with them; and on one occasion at least, during the three months preceding the testatrix's death, the wife of one of the contestants stayed alone with the testatrix, at the request of Mrs. Hartnett while she went shopping. And no testimony whatever was introduced to show, nor do contestants claim that on any of these occasions did the testatrix complain or indicate that any person was persuading or attempting

to influence her to do or refrain from doing anything against her own desires, or that she was being imposed upon or prevented from carrying out her own wishes, or for any reason was unable to do so. Even conceding, therefore, that the evidence justifies the inference that there was opportunity, coupled with motive, on the part of the Hartnett family, to exercise an influence over her, there is an entire absence of evidence indicating that any attempt was made so to do. ■ Nor does the single fact that one of the beneficiaries accompanied the testatrix to the bank, and another to the attorney's office, when she directed the preparation of said wills and executed the same, afford legal ground for a finding that they were products of undue influence. (*Estate of Donovan*, 114 Cal. App. 228 [299 Pac. 816]; *Estate of Morcel, supra*.) As stated, the will now under attack was identical in its dispositive language with the former will, which was executed some three months before; consequently the subsequent will was a complete confirmation of the wishes of the testatrix as expressed in the first will, which of itself, under the authorities, may be taken as a circumstance tending to refute the charge of imposition or undue influence (26 Cal. Jur. 657) and to show a permanent and fixed state of mind on the part of the testatrix with respect to the disposition of her estate (*Estate of Stump*, 202 Cal. 308 [260 Pac. 543].)

■ Contestants contend, however, that in any event the evidence is sufficient to establish a confidential relationship between Lucy Hartnett and the testatrix, which gave rise to a presumption of undue influence legally sufficient to create a conflict in the evidence and thus sustain the verdict. We are unable to sustain this contention. The legal doctrine sought to be invoked is stated in the *Estate of Lances*, 216 Cal. 397 [14 Pac. (2d) 768], as follows: "Where one who unduly profits by a will sustains a confidential relationship to the testator and actively participates in procuring the execution of the will, the burden is upon him to show that the will was not induced by his undue influence. (*Estate of Shay*, 196 Cal. 355, 363 [237 Pac. 1079]; *Estate of Gallo*, 61 Cal. App. 163 [214 Pac. 496].)" But as indicated by the foregoing statement, such presumption is not generated alone by the existence of a confidential relationship. (*Estate of Presho*, 196 Cal. 639 [238 Pac.

944].) Such relationship "assumes probative importance when disclosed in conjunction with the facts that the provisions of the propounded instrument are unnatural or unjust, and that the alleged wrongdoer was active in procuring the writing to be executed. If the facts of injustice and activity on the part of the wrongdoer are not established, a denial of probate cannot be sustained." (26 Cal. Jur. 652, citing authorities.) In other words, to use the language of the Supreme Court: "There must in addition be proof that the one occupying such relationship displayed activity in the preparation of the will to his undue profit" (*Estate of Presho, supra*), meaning that there must be proof that the will is unnatural. Moreover, it is well settled that collateral heirs, such as brothers and sisters, are not "natural objects of bounty" as that term is used in the interpretation of wills, and therefore, in cases such as this, where the next of kin are collaterals and one or more are unprovided for in the will, the pretermitted persons, in order to establish that the instrument is unnatural, must show affirmatively that they had peculiar or superior claims to the decedent's bounty; and if no such claim is adduced, the instrument cannot be held to be unnatural. (26 Cal. Jur. 695, 696.)

Even assuming, therefore, that the evidence in the present case is legally sufficient to support the contention that a confidential relationship existed between the testatrix and Lucy Hartnett on account of the latter's helpfulness in assisting her aunt to attend to the business matters above mentioned, there is no ground upon which it may be reasonably held that such helpfulness resulted in the procurement of an unnatural will. It is true, as contestants point out, a strong bond of affection existed between the testatrix and them, but obviously it was no stronger than the one existing between the testatrix and the beneficiaries; and in addition it appears without conflict that the personal relationship which the testatrix always maintained with the beneficiaries was closer and more intimate and companionable than the one maintained with her brothers. Therefore, in view of the lifelong close association between the testatrix and her sister, and the fact that the Easton and the Hartnett families lived happily together in the same house for several

years, and bearing in mind, too, that the testatrix knew at the time she made both wills of the nature of the fatal malady with which she was afflicted, and which doubtless brought to her mind the special care and attention her condition would necessarily eventually demand from Mrs. Hartnett and her daughters while she continued to live in their home, it cannot be reasonably said in the absence of additional proof that the desire on her part, as expressed in both wills, to leave her entire estate to them, was unnatural.

With respect to the question of presumption of undue influence, the situation here is essentially no different, in our opinion, from the one presented in the *Estate of Donovan, supra.* There the appeal was taken from a judgment of nonsuit. The testatrix, Mrs. Donovan, was a widow and the mother of five adult children. By deed and will she gave substantially all of her estate, including the portion inherited from her husband's estate, to her youngest daughter, Mrs. Ann J. Finney, in whose home Mrs. Donovan was confined for several months preceding her death, suffering from the effects of a broken leg. Mrs. Finney's husband was a practicing attorney and at Mrs. Donovan's request he called in an attorney who was a friend of his to consult with her, and who afterwards drew the deed and the will. There was a lapse of about two months between the execution of each instrument, and Mrs. Finney and her husband were present on the two occasions when Mrs. Donovan gave the attorney the instructions as to the disposition of her estate and at the time of the execution of both instruments. The other children contested the will upon the ground of undue influence, and among the other contentions made was that a confidential relationship existed between Mrs. Donovan and the Finneys, and that therefore the activity of the Finneys in selecting the attorney, coupled with the fact that they were present during the conferences between the testatrix and said attorney and at the time of the execution of both instruments, gave rise to a presumption of undue influence which would have been legally sufficient to sustain a verdict setting aside the will. The court held, however, in conformity with the decisions heretofore cited, that those factors alone did not constitute

undue influence. Moreover, in discussing the element of the alleged unnaturalness of the will the court said: ''Where the right of testamentary disposition exists, the owner of property should be permitted to say who should be the object of his bounty and this right should not be limited or subjected to the views of others. Whether in the minds of others a will is just or unjust is a matter of opinion and to permit a jury to determine the question without that substantial evidence which the law requires would be to permit a jury to make the disposition irrespective of the desires of a testator.''

In the present case one of the contestants testified that he had loaned Mrs. Easton's husband $150 which had not been repaid, and that after Easton's death the testatrix ''always said, . . . I will some day fix you up''. But the fact that she did not repay the money during her lifetime nor make suitable provision in her will for its repayment does not furnish legal reasons for setting aside her will upon the ground of undue influence. The evidence also discloses that the lifelong friendship which had existed between the contestants and the Hartnetts terminated abruptly shortly after Mrs. Easton passed away. In this regard it appears that the brothers complained of what they considered was undue haste in removing Mrs. Easton's body from the Hartnett home to the undertaking parlor after they were notified of her death and before they arrived at the house. Their complaint brought forth some unpleasant words between one of the brothers and Mrs. Eckenroth, and during the conversation Mrs. Eckenroth's husband, so the brother testified, threatened him with violence. But this unfortunate incident could have no legal bearing upon the question of whether Mrs. Easton was acting under undue influence when she made either of said wills, because, as stated, the quarrel took place after her death.

Therefore, inasmuch as the evidence failed as a matter of law to meet the legal requirements for nullification of a will upon the ground of undue influence, as those requirements are fixed and declared by the decisions above cited, the verdict was against law and the trial court was justified in granting a new trial on that ground.

Contestants urge also that the notice of intention to move for a new trial was filed too late, and that therefore the

trial court was without jurisdiction to grant an order in that behalf. They concede that said notice was given and the motion for new trial presented in conformity with the provisions of section 659 of the Code of Civil Procedure, as amended in 1929, and that said section as so amended was operative at the time the notice was given and the motion presented. But it is argued that the amendment of 1929 is unconstitutional and that consequently said section as it existed prior to said amendment prevailed. It contained a provision requiring notice of intention to move for a new trial to be filed "within ten days after verdict, if the trial was by jury".

The title to the act amending said code section read as follows: "An act to amend the Code of Civil Procedure by amending sections 650, 657, 659, 660, 953a and 953c thereof, and to add certain new sections thereto, to be numbered sections 659a, 661 and 662, respectively, relating to findings, judgments, new trials and appeals"; and the body of the act contained the nine amended code sections relating to findings, judgments, new trials and appeals. ■ The ground upon which contestants seek to have the act declared unconstitutional is that the title embraced more than one subject, in violation of section 24 of article IV of the state Constitution. There would seem to be ample authority for holding the contention untenable, because, as pointed out in the following cases, numerous provisions which are germane to and deal with one general object, if fairly indicated in the title, may be united in one act. (*Evans* v. *Superior Court,* 215 Cal. 58 [8 Pac. (2d) 467]; *Tarpey* v. *McClure,* 190 Cal. 593 [213 Pac. 983]; *In the Matter of the Application of Schuler,* 167 Cal. 282 [139 Pac. 685, Ann. Cas. 1915C, 706]; *Hill* v. *Board of Supervisors,* 176 Cal. 84 [167 Pac. 514]; *Heron* v. *Riley,* 209 Cal. 507 [289 Pac. 160]; *Law* v. *San Francisco,* 144 Cal. 384 [77 Pac. 1014]; *Buelke* v. *Levenstadt,* 190 Cal. 684 [214 Pac. 42].)

■ But it is unnecessary to inquire further into the constitutional question for the reason that even under the provisions of the code section as it previously existed the notice of intention was served and filed within time because the period of time fixed thereby was tolled by the action of the trial court in entering judgment for proponents *non*

*obstante veredicto* and by the appeal taken from the order made in that behalf (*Estate of Caldwell*, 216 Cal. 694 [16 Pac. (2d) 139]).

The order granting a new trial is affirmed.

Gray, J., *pro tem.*, concurred.

TYLER, P. J., Dissenting. — I dissent. The evidence shows that a trust relation existed between respondent Lucy Hartnett and the deceased. It further shows that while deceased was suffering from the ailment which caused her death she executed two wills, the first of which was substantially the same as the one in question. In the execution of both wills respondent Lucy Hartnett was present and took an active and important part in their preparation. She discussed the matter of the making of the wills with deceased and arranged for their execution and was present when they were signed. After the will was executed she took possession of the same and placed it in her safe deposit box. There is also evidence that deceased was never permitted to see her brother alone, some one of the beneficiaries being always present when he called. This and other evidence in the record surrounding the execution of the will is, in my opinion, amply sufficient to support the verdict setting aside the will on the ground of undue influence.

A petition for a rehearing of this cause was denied by the District Court of Appeal on September 8, 1934.