[Civ. No. 6462. Second Appellate District, Division Two.—June 26, 1929.]

In the Matter of the Estate of CARL WITHINGTON, Deceased. GEORGIA MAY WITHINGTON, Appellant, v. LYSLE WOODWARD WITHINGTON et al., Respondents.

Luce & Swing and Albert J. Lee for Appellant.

Ed. P. Sample and Harden & Green for Respondents.

CRAIG, J.—On October 23, 1925, Carl Withington died testate at San Diego, California, leaving him surviving a widow, Georgia May Withington, contestant and appellant herein, and a brother and three sisters. By his will, dated October 15, 1925, he gave, devised and bequeathed to Louis Kucick and Peter Donarlache $10,000 each, to one Lucille Moore, $20,000, and to his brother and sisters the rest, residue and remainder of his estate, share and share alike, "understanding that my wife, Georgia May Withington, takes by operation of law, upon my death, certain of our community property." The widow contested the will upon various grounds, and at the conclusion of her evidence the jury were instructed to return a verdict in favor of the proponents. Judgment having been rendered accordingly, she appealed therefrom.

Three grounds or causes of action were asserted in the petition for revocation of the will, and for letters of administration. First, insanity was alleged, in that from some period prior to October 15, 1925, to the date of his death, the testator was not of sound or disposing mind or memory to make a will or to dispose of his property, or to understand his relations to other persons. Second, that Lucille Moore had caused him to separate from his wife, and had prevented

a reconciliation; that he had lived in illicit relations with Miss Moore, who, by threats and otherwise had caused him to fear her, and that she, together with the decedent's sisters, had secured domination and control over his mind and actions, and caused him to dispose of his estate by will, whereas he had intended and promised the contestant that it would be distributed during his lifetime. Third, that Lucille Moore had falsely accused the contestant of infidelity, and lack of affection or sympathy for the decedent during his illness, protesting her own love and sympathy for him, falsely representing that his wife did not wish a reconciliation; that she refused to permit the contestant to visit her husband, or to communicate with him. This count or ground of contest attempts to charge statements, representations and acts in the nature of fraud, and alleges that the testator was caused to rely thereon, and to believe that he could not return to his home, as a result of all of which he executed the will in controversy, making substantial bequests to Lucille Moore which he would not otherwise have made, and that by his said will the testator deprived "his said wife of her just, rightful and proper share of his estate"; and that "the said Carl Withington would not have executed the purported will herein mentioned were it not for the said acts and conduct of the said Lucille Moore mentioned herein."

It appears that both the testator and the appellant had previously had other spouses, but that notwithstanding that fact they had then maintained exceedingly intimate relations. She testified that she herself had been attacked by the decedent's former mate for her associations with him, prior to the time she married him, and censured by Withington for visiting the Tia Juana resort of, and being friendly with, one Grundy. Withington had for many years been engaged in conducting saloons, gambling houses and assignation resorts in California and in Mexico, prior to and during his marriage with appellant, with some of which she was familiar, and from one of his places of business at Tia Juana she had drawn considerable sums of money. Their marital relations were not blessed with constant congenial peace and quiet; they discussed the subject of divorce, each suggesting that the other obtain a decree, and Withington upon one occasion told the appellant, "either you get a divorce or I will." Shortly thereafter appellant proposed,

"I would get a divorce and I would go my way and he could go his," if he would "do the right thing" by her in a financial way. She testified that they had "little disputes," and that at one time, after complaining that she did not love him, and that he had heard rumors, he knocked her down. About the month of May, 1925, Mrs. Withington consulted an attorney regarding divorce proceedings, when she was informed that Withington was living with Lucille Moore, although she had not seen him since January, 1924, and did not see him, until August, 1925, or two months after the deceased first entered the hospital for treatment. There were then negotiations between the parties toward a property settlement, Mrs. Withington demanding $350,000, and her husband offering $250,000, which she declined, and filed suit, praying the appointment of a receiver, an accounting, and division of the property. During the attempted compromise Withington, appellant testified, came to her weeping and hysterical, and considered returning home, suggesting that they "bury the hatchet," stating that he was trying to get his health back, and was sorry for past difficulties; that he said: "I cannot give you such money as you are asking." "I am trying to do the right thing by you and do not intend to beat you out of a thing." During direct examination she testified further regarding this phase of the controversy; "I asked him if he had made a will and he said no." "He grasped me and kissed me good bye"; "he was to come back in ten days, but he did not come back"; "I asked him, 'What about my attorney's fees?' He says, 'Well, I will pay them'"; "he wanted to bring his nurse there too"; "I met Dr. Rees and Dr. Brown in front of Jedlick-Heim's on the corner of Broadway,—or on the corner of Sixth and C, and talked to them one night in regard to his condition, and why he could not come home, or why it was he was not coming home, and they said he was too sick." Shortly thereafter the decedent was again removed to the hospital, and following blood transfusions and operations which proved of no avail, appellant learned of his demise.

Lucille Moore continued with or near the testator during all of the several months of his last illness, both at her home and at the hospital, preparing his meals, and caring for him. Appellant visited the house last mentioned, upon at least one occasion bearing flowers, but she testified that she made no

effort to learn what hospital he had entered; "I did not think it my duty to find out about his condition"; "This other woman was there with him all the time he was in the hospital, and until he died, and at the funeral"; "my pride would not permit me to attend his funeral; I sent no flowers"; that she had no reason to write him, and "was never going to run after him." She also testified that she feared Lucille Moore was having quite a bit of influence over the decedent, and that he was giving her "a portion of my community property," but that she knew that the law would allow her one-half of the community property, and that he could not will it away. Upon the other hand, all of the testimony upon the subject indicates that Lucille Moore and Withington did not agree, that she drank to excess, and was at times angry, hysterical and abusive toward him; that she stated that having cared for him during all of his illness and tribulations, it would break her heart should he return to his wife. A nurse testified that Miss Moore during one fit of intoxication procured a revolver and threatened to shoot the decedent, but that she disarmed her by force. Various quarrels and arguments occurred, but at none of these times does the subject of a will, or of a property allowance, appear to have been the cause of any such unpleasantness, or to have been mentioned. There is a striking absence of evidence of even a suggestion by Lucille Moore, or by any of the testator's relatives, as to a will or regarding his property. To the contrary, close attendants and friends who were present during his illness, swore that they did not hear the subject mentioned, except when Withington sent for an attorney, and when the will was produced, witnesses were summoned, and the document was executed. One witness did say that Lucille Moore remarked before the will was signed that she was not satisfied with its provisions, but there is no testimony tending to indicate that Miss Moore was in any manner instrumental in or connected with its preparation, or that she actually knew its contents.

There was absolutely no proof as to insanity or incompetency of the testator, as charged in the first ground of contest. All of the witnesses, including the attending physician and nurses, testified that he was not only of sound mind at all times, but that he was exceedingly keen and alert up to and including the last hours of his life.

■ We have especially scanned those features of the evidence tending to exhibit the intimate relations of the testator and Miss Moore, and have made a careful and exhaustive review of the entire record, which embraces the judgment-roll, and the testimony, as well as the hospital charts and the proceedings in probate. From it all, we are unable to find support for the allegations that this beneficiary, either alone or in conjunction with Withington's relatives, attempted to persuade or coerce him to make a will, or to make any disposition of any portion of his estate. Conceding, for argument's sake, that her protestations of love for him, and her statements that appellant did not care for him, were false and were made solely for the purpose of appealing to his sense of benevolence, it cannot be said in the absence of substantial proof of effective dishonesty upon the part of the beneficiary, that a sane man was unduly influenced to give her what he deemed appropriate. Testimony was also adduced tending to show that he realized the existing jealousy between his wife and Lucille Moore, and that he desired to protect them both, but that if he pleased either he would incur the wrath of the other. A witness testified that Withington quarreled with appellant and with Miss Moore, and that apparently there was "no affection between any of them." Under all of the evidence before us, we are impelled to conclude that the testator may well have been deemed by the trial court as having exercised normal faculties and to have merely exercised his undoubted right to make such disposition of his property by will as he saw fit. There is no evidence that his sisters were parties to any wrongful influence in this respect. Whenever the decedent considered returning to his wife they favored it; they were present during his illness, and at the time of the execution of his will, but aside from such not unusual occurrences, their connection with the case is insignificant.

■ We have thus treated the second and third counts or grounds simultaneously, since the alleged confidential and illicit relationship between Withington and Lucille Moore, claimed to have resulted in the separation of the decedent and appellant, the preventing of a reconciliation, and the procurement of a will depriving the contestant of a substantial portion of her share of the estate, constitute the substance of each. We conclude that the testator was neither

directly nor indirectly caused by undue influence, fear or fraud to make the will which he did make, nor is there sufficient evidence tending to indicate that he was at that time insane or incompetent to do so intelligently, to require or justify a reversal.

It is no less apparent that the will itself is valid in its provisions for various beneficiaries, and conveys no property to those other than the widow which the testator might not legally have devised and bequeathed to them without jeopardizing her share of the community. Of an estate appraised at more than $878,000, which had been accumulating for many years prior to the marriage of the contestant and the decedent, which existed but about six years, he gave to two intimate friends, one of whom aided him materially, $10,000 each, and to Miss Moore $20,000. To his brother and sisters he gave the rest, residue and remainder of his estate, "understanding that my wife, Georgia May Withington, takes by operation of law, upon my death, certain of our community property." Express bequests aggregating but $40,000, from an estate of such comparatively large proportions, though doubtless disconcerting, cannot upon the record before us be held legally injurious to the interests of the contestant.

 Appellant testified that the testator promised that he would make no will, and that he handed her a list of his properties, promising to furnish her with other papers and documents, the nature of which she did not state; that she was informed—and certain witnesses corroborated her in asserting—that Lucille Moore may have obtained from Withington's effects a box and some moneys or securities which were secreted and withheld from the estate. Contestant attempts to infer from these and other facts and circumstances heretofore set forth, that Miss Moore had custody and control of the decedent and his affairs, and that she succeeded in preventing appellant from receiving her share of the estate, and that the will was unnatural. It is nowhere ventured, however, that Withington at any time promised the contestant more than her share of the community property. In any event, he was legally entitled to change his mind, and to make a will otherwise disposing of his separate property and his share of the community. As already observed, his condition mentally, and his en-

vironment, were such that no unnatural or improper influence or coercion appears to have diverted his dispository act from his true intentions. The most that can be said of the relations and actions of persons about him is that they furnished opportunities and circumstances which might create a suspicion of attempted unfair advantage. But this is not sufficient to justify a court in overturning the plain directions of a last will and testament which is otherwise valid. It therefore follows that the will in controversy is legally a natural one, and that its provisions do not exceed the legal bounds of the testator's properties, or infringe upon the statutory rights of the contestant.

This case is not appreciably unlike that presented in *Estate of Langford,* 108 Cal. 608 [41 Pac. 701], wherein the grounds of contest were similar to those here urged, against the provisions of a will conveying to another more of the estate than the contestants anticipated or approved. It was submitted to a jury, who declared it invalid, and in reversing the judgment the Supreme Court said:

"The consideration of the question whether or not a will is 'unnatural'—by which is meant, we suppose, different from what it might have been expected to have been—is of no importance except in a case where there is some evidence immediately tending to show mental incapacity, fraud or undue influences; in which event it might serve to help out a weak case. But there is no evidence in the case at bar that could be thus helped out. A will cannot be upset *because* in the opinion of a jury or court it is unnatural. In the opinion of the McDevitt case [95 Cal. 17, 30 Pac. 101], it is said: 'Although I do not think it of special interest here, it is well to remember that one has the right to make an unjust will, an unreasonable will, or even a cruel will. Generally, such questions turn our thoughts, as they are often intended to, from the only question at issue, which always is, only, Is the will the spontaneous act of a competent testator? Of course, juries lean against wills which to them seem unequal or unjust. But the right to dispose of one's property by will is most solemnly assured by law, and is a most valuable incident to ownership, and does not depend upon its judicious use. The beneficiaries of a will are as much entitled to protection as any other property owners, and courts abdicate their functions when they

permit the prejudices of a jury to set aside a will merely upon suspicion, or because it does not conform to their ideas of what was just and proper.' (See, also, *Latham* v. *Udell*, 38 Mich. 238.) And, indeed, if it were important to consider it, we do not see how the will in the case at bar can be considered unnatural in such extreme sense as to be remarkable. . . .

"If the law is to be changed, and the right of disposing of one's property by will, the policy of which has been sanctioned by the wisdom and experience of many generations of men, is to be taken away, that result must be effected by the legislative department of the government. As the law now stands that right. cannot be frittered away after the death of the testator according to the tastes and notions of others. It is quite likely that in the case at bar the provisions of the will did not meet with the approval of the jurors; but their approval was not necessary."

In the recent decision of the *Estate of Smith*, 200 Cal. 152 [252 Pac. 252], the testator's will was contested by his widow upon grounds of alleged incompetency, fraud, undue influence and persuasion to make a will while in a "dazed" condition. The cardinal principles in such cases are announced in an exhaustive opinion by the court, upon a thorough review of nearly all of the authorities of this state, in the following language:

"The actual mental condition of the decedent at the time of the execution of the will is the question to be determined upon a contest based on his alleged incompetency and evidence tending to show unsoundness of mind either before or after the execution of the will is important only in so far as it tends to show mental condition at the time of the execution of the will. (*Estate of Perkins*, 195 Cal. 699 [235 Pac. 45]; *Estate of Casarotti*, 184 Cal. 73 [192 Pac. 1085]; *Estate of Dolbeer*, 149 Cal. 227 [9 Ann. Cas. 795, 86 Pac. 695].) To overcome the presumption of sanity the contestant must show affirmatively and by a preponderance of the evidence that the testator was of unsound mind at the time he executed his will. (*Estate of Casarotti, supra; Estate of Dow*, 181 Cal. 106 [183 Pac. 794].) . . .

"A testator is of sound and disposing mind and memory if, at the time of making his will, he has sufficient mental

capacity to be able to understand the nature of the act he is doing, and to understand and recollect the nature and situation of his property and to remember, and understand the relations to, the persons who have claims upon his bounty and whose interests are affected by the provisions of the instrument. (*Estate of Sexton,* 199 Cal. 759 [251 Pac. 778]; *Estate of DeLaveaga,* 165 Cal. 607 [133 Pac. 307]; *Estate of Huston,* 163 Cal. 166 [124 Pac. 852].) . . .

"Undue influence has been repeatedly defined to be 'the exercise of acts or conduct by one person toward another person by means of which the mind of the latter is subjugated to the will of the person seeking to control it.' (*Estate of Newhall,* 190 Cal. 709, 717 [28 A. L. R. 778, 214 Pac. 231, 234], that 'In order to establish that a will has been executed under undue influence, it is necessary to show, not only that such influence has been exercised, but also that it has produced an effect upon the mind of the testator by which the will which he executes is not the expression of his own desires. . . . The presumption of undue influence is not raised by proof of interest and opportunity alone. In order to set aside a will for undue influence, there must be substantial proof of a pressure which overpowered the volition of the testator at the time the will was made.' . . .

"The fact that the will of a testator may be unnatural, unfair, or unjust creates of itself no presumption that the decedent was incompetent or that the instrument was procured by undue influence, nor does it shift the burden of the . proponent. In *Estate of Martin,* 170 Cal. 657, 663 [151 Pac. 138, 141], it is declared that 'a testator has the right to make an unjust, or an unreasonable, or even a cruel will and that no will may be legally set aside upon the mere establishment that it is such a will.' "

█ Under the facts of the case last quoted, which we need not relate, incompetency, misrepresentations, influences and bequests contrary to antecedent expressions of intention, all contributed to suggest the unnatural character of the will, if not its unreasonableness, far more strongly than do those of the instant proceeding. Yet it was said in effect that, measured by these rules, the contest was not sufficiently supported by substantial evidence to show that the will in suit was not the true expression of the testator's desires.

Hence, if the will is in all respects legal and valid, and the evidence is not of a preponderating weight sufficient to warrant any judgment for the contestant, it would not only be an idle act, but perhaps an expensive and inexpedient one, to submit the issues to a jury for decision. It follows that this case falls within the ruling applicable to nonsuits, since a verdict or judgment in favor of the contestant would necessitate an order setting it aside upon motion therefor. (*Estate of Bryson*, 191 Cal. 521 [217 Pac. 525]; *Estate of Casper*, 172 Cal. 147 [155 Pac. 631]; *Estate of Luckenbach*, 205 Cal. 292 [270 Pac. 961].) It was not error for the trial court to direct, as it did, that the jury find a special verdict upon each of the issues presented, in favor of the proponents.

■ It is further contended that the contestant was erroneously precluded from introducing, over the objection of the proponents, evidence of disreputable character and occupation of Lucille Moore thirteen years prior to the date of the will, and of the testator's knowledge thereof. It was represented during the trial that two witnesses would testify that in 1912 this beneficiary was a prostitute, and an inmate of a house of ill fame at Taft, California, in which Withington then had an interest. It is argued that such evidence would tend to show the probability of her scheming to obtain his property, and the unnatural character of the will through which she benefited. It is not suggested, however, that she continued thereafter to follow a dissolute life or occupation as before, nor do we coincide with appellant's assertion that there is any evidence upon which this proof, though it be a fact, would tend to throw light favorable to her cause. It is appropriately within the exception noted by the contestant's authorities, as "too remote in point of time or wholly unconnected with any other evidence showing the exercise of undue influence." The most that can be said of the proffered proof is, that it *might* have contributed to the mere furnishing of opportunity for undue influence, but in the absence of substantial proof of the principal issue, evidence of opportunity therefor, as we have seen, is of no probative force or effect whatever.

■ Finally, it is insisted that paragraph VI of proponents' answer by its insufficiency as a specific denial of certain allegations of the contestant's petition, constitutes

admissions of facts which if taken as true would render a verdict for the former erroneous. By five subdivisions, said paragraph of the petition alleged that the decedent's will, if executed at all, was procured by the undue influence of Lucille Moore, aided and abetted by the testator's three sisters, and was not the free and voluntary act of Carl Withington. As grounds of this alleged conclusion, it recites (1) that Withington and Lucille Moore had lived together illicitly; (2) that he was in fear of her, and that by threats and other means she secured domination and control of his actions; (3) that their relations had been illicit and confidential, and that she had assumed the position and authority of his legal wife, and dictated the management and disposition of his properties; (4) repeating various of the foregoing allegations, it is averred that Withington permitted Miss Moore to assume and exercise such control; and (5) that Withington separated from his wife through his own fault, thereafter desiring a reconciliation, which was prevented by Miss Moore. Other facts and circumstances, claimed by the contestant to have constituted undue influence and coercion, as heretofore stated, are then charged, and it is alleged that but for the same a reconciliation would have been effected, that the decedent would have returned home, and would not have executed the will in question. The proponents deny that said will was procured or caused to be executed by undue influence of Lucille Moore, or any other person, or that it was the result of any undue influence, or was not the free and voluntary act of the testator. It is quite apparent that this is not a specific denial of each and every detailed circumstance of the petition, yet if under the pleadings as issue was joined, the contestant was unable to prove that undue influence in any manner entered into the transaction, denial of the manner in which it was alleged to have been exercised or opportunity therefor was obtained, would be unnecessary. It appearing that said will was the free and voluntary act of the testator, proof of his relations with said beneficiary, as already observed, bears no probative force in this proceeding. Again, since the contestant introduced evidence in attempted proof of the allegations of her pleading, as though fully denied, she may not now complain of the in-

sufficiency of the answer, if it be insufficient, in this regard. .(*Henderson* v. *Northam*, 176 Cal. 493 [168 Pac. 1044].)

The judgment is affirmed.

Thompson (Ira F.), J., concurred.

Works, P. J., being absent, did not participate in this opinion.

A petition for a rehearing of this cause was denied by the District Court of Appeal on July 25, 1929, and the following opinion then rendered thereon:

THE COURT.—In denying this application for rehearing, we are impelled to condemn intemperate statements therein contained, referring to parts of the opinion in an impertinent and disrespectful manner not warranted by the record. It is said concerning the following from the opinion: "It appears that both the testator and the appellant had previously had other spouses, but that notwithstanding that fact they had maintained exceedingly intimate relations," that it is "an unjustified and unfair aspersion upon the character of the contestant." This statement is utterly untrue. The contestant's own testimony amply supports the essential assertion contained in the paragraph above attacked, that the testator and appellant had maintained exceedingly intimate relations while having other spouses. She at first denied knowing Withington before she married him. Thereafter she testified that she knew him five years before they were married, at which time she was married to a man named Hanes. She then ran a rooming-house, and Hanes was a bookkeeper in a grocery store; that Withington brought his first wife there to rent an apartment, as "the proposed Mrs. Withington"; that thereafter she met Withington by appointment at hotels in Los Angeles, Calexico and San Diego, and stayed at the same hotels with adjoining rooms. She testified that he had a wife living, and she still had a husband. That one Cucick, acting on behalf of Withington, brought her from Calexico to San Diego to meet Withington; that upon this occasion the then Mrs. Gladys Withington, meeting contestant on the street, pushed the latter, who tripped on the curb and fell, and that the

difficulty was occasioned by contestant visiting Withington. Again, that Mrs. Gladys Withington went to the house where Withington and his bookkeeper were occupying adjoining and connecting rooms at Calexico with contestant, and on this occasion, on warning from Cucick that Mrs. Withington might do some harm, contestant left Withington's apartment, and Mrs. Withington entered contestant's (then Georgia May Hanes) apartment, "breaking up all the furniture and the glass out of the door and the flower-pots." Concerning the manner in which contestant and Withington lived in the apartment house at Calexico, we quote the following from her testimony:

"Q. Well, you and Mr. Withington at no time occupied the same room there? A. Why, he had his room in connection—

"Q. In connection? A. (Continuing) —with my apartment, he and his bookkeeper.

"Q. Right off of your apartment? A. Yes sir.

"Q. His room—and did you ever have to get out of that room hurriedly on notice that Mrs. Withington was there for some purpose? A. Well, if I remember right, I did one time."

We are satisfied that the statement contained in the opinion that contestant and Withington "maintained exceedingly intimate relations" before they were married is amply justified and that the assertion in the petition to the contrary is wholly unwarranted.

Again, the petition assails as wholly unjustified by the evidence and as contrary to the evidence, the statement in the opinion that "their marital relations, as upon previous ventures, were not blessed with constant congenial peace and quiet." From contestant's testimony it appears that when first married she and Withington lived at Venice for about a month; that they had "little disputes"; that upon one occasion thereafter Withington accused her of being in love with one Grundy; that "we had an argument, and he struck me and knocked me to the floor and it bruised me up terribly"; that thereafter they discussed the subject of divorce more than once and negotiated concerning a property settlement. No important inaccuracy is pointed out.

We have not attempted to give all of the evidence in support of either of the assertions in the opinion referred to and

assailed in the petition in an unwarranted manner, nor to pay attention to a number of other instances of a similar character in the petition, but since it is replete with exaggerated and improper assertions, we feel that the impropriety of this character of petition cannot be passed entirely unnoticed.

The petition for rehearing is denied.

Works, P. J., being absent, did not participate in this order.

A petition to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on August 22, 1929, and an application for modification of the opinion rendered in denying the petition for a rehearing was denied by the District Court of Appeal on September 4, 1929.

All the Justices present concurred.