[L. A. No. 10383. In Bank.—September 29, 1928.]

In the Matter of the Estate of JOHN LUCKENBACH, Deceased. ANTON H. LUCKENBACH et al., Contestants and Appellants, v. LENA LUCKENBACH, as Executrix, etc., Respondent; KATHERINE PIRAUX, Intervener and Appellant.

Thomas P. White, Ossian Cameron and Edward H. S. Martin for Appellants.

Hewitt, McCormick & Crump for Respondent.

SEAWELL, J.—This appeal was taken by the contestants of the will of John Luckenbach, deceased, from a judgment of nonsuit entered against them in a contest instituted after the admission of said will to probate.

Contestants are two brothers and two sisters of the decedent. As grounds for revoking the probate of said will, which devised and bequeathed the testator's entire estate to his wife, Lena Luckenbach, respondent herein, if she should survive him, and appointed her executrix, contestants alleged that the decedent was incompetent to make a will and of unsound mind. They further alleged, upon information and belief, that he did not know the contents of the will, that it was not executed in the manner required by law, and was fabricated and forged by altering a will of said decedent. In addition, it was alleged that the execution of the will was procured by the fraudulent promise of testator's wife that if he would devise all his property to her she would,

after his death, provide and care for all of his brothers and sisters according to their needs, which promise she made with intent to deceive and without any intention of performing it. The tenth and last ground of contest is designed to set forth facts constituting undue influence on the part of said wife. It is therein alleged that for ten years immediately prior to his death John Luckenbach was afflicted with disease of both body and mind and was under the domination and control of said Lena Luckenbach, a woman of strong and domineering mind; that said Lena Luckenbach, with the intention of procuring said John Luckenbach to execute the said purported will, and taking undue and unfair advantage of his necessities, fears, and distress of mind and body, many times before the execution of the will falsely stated to John Luckenbach and caused him to believe that his brothers and sisters, particularly the petitioners, already had their present and future financial needs well provided for and would not and could not preserve or take care of any property which they might receive from his estate at his death, and had no affection for him, and were anxiously awaiting his death to obtain his property and squander the same; and, further, threatened him and caused him to believe that if he did not will and devise all of his property to her, the said Lena Luckenbach, she would cause him great trouble in his lifetime and make life miserable for him, and by means of such statements, threats, and demands influenced him to execute said will.

In her answer Lena Luckenbach specifically denied all allegations as to the invalidity of the will, and also alleged that the property was the community property of decedent and herself, and that she, as surviving wife, would be entitled to the whole thereof if decedent died intestate.

Decedent died on January 9, 1926, a resident of the county of Los Angeles, leaving an estate appraised at $663,852.40. His will here attacked was dated December 18, 1924. He was about fifty-eight years of age at the time of his death and left surviving him his said wife, Lena Luckenbach, whom he had married in Green Bay, Wisconsin, in 1890. No children were born to the couple and decedent's parents had predeceased him by many years. In addition to his wife, he left surviving him three brothers and four sisters, residing in the states of Illinois and Wisconsin. Two of said brothers,

Anton H. and Simon Luckenbach, and two of the sisters, Mary O'Brien and Katherine Piraux, are the contestants herein, Katherine Piraux having joined in the contest by petition in intervention. Two other sisters and another brother have not joined in the contest.

The evidence adduced to establish the testator's unsoundness of mind and mental incompetency falls far short of the requirements of the law. In that connection contestants rely upon an alleged unnaturalness in the disposition of decedent's property and upon statements made in a certain legacy in his will, which, they contend, indicate that decedent was affected with an insane delusion regarding them, of which insane delusion said will is a product.

We find nothing unnatural in the disposition made by the testator of his property. In the event that his wife survived him, he bequeathed his entire estate to her. While the other provisions of the will did not take effect, since the testator's wife survived him, nevertheless a brief review of said provisions is important in the consideration of the testator's mental condition. He first directed that his entire estate be converted into money. After providing that $50,000 should be set aside for the erection of a mausoleum for the bodies of himself and his wife, and providing for the upkeep of said mausoleum, the testator created a trust fund of $10,000, the income from which was to be disbursed by the trustee named for the education of a son of the testator's secretary until he attained the age of twenty-one, said income then to be paid to him until he attained the age of thirty, when the trust was to terminate. A similar trust fund was created for another son of the testator's secretary, and a trust of $5,000 for Martha Angus Carroll, whose relation to the testator does not appear. He then bequeathed $20,000 to a trustee to pay the income to a daughter of his wife's sister for life. Next follows the provision upon which contestants lay great stress and insist that it indicates that the testator was the victim of an insane delusion with reference to them. In said provision he bequeathed $10,000 to a trustee to pay the income to Edith Luckenbach, daughter of his brother Anton, *"for her education,* the disbursement thereof to be directed by my said trustee, *and after she has attained the age of eighteen years,* to pay said net income unto her during her natural life." (Italics supplied.) At

the time of the execution of the will Edith Luckenbach was thirty-five years of age. She had pursued a student's life and had taken degrees at Harvard and Columbia colleges, which facts, it is claimed, should have been known to the decedent, as she had visited him upon one occasion at his home during the month of August, 1924, a few months before the execution of the will. The said provision will be more fully considered hereafter.

A legacy of $25,000 was bequeathed to a former business associate and $50,000 to his secretary, whose sons he remembered in previous paragraphs of the will. Said legacies were made "because of the faithfulness and loyalty of the legatees." To the Grand Lodge of Free and Accepted Masons of the state of California was bequeathed $100,000, to be expended for the care of orphans or the aged in Masonic homes, to the Benevolent and Protective Order of Elks, Lodge 99, $100,000, to be used for the charity work of the order, and to the Christ Episcopal Church of Green Bay, Wisconsin, $2,000.

The residue of the estate, which was considerable in magnitude, was bequeathed to the Pacific Southwest Trust and Savings Bank, in trust to pay the interest semi-annually in equal shares to William Luckenbach, a brother of decedent, but not a contestant herein; Anna Luckenbach, a sister of decedent, but not a contestant; Katherine Piraux, a sister and a contestant; Josephine Luckenbach, a sister of decedent who predeceased him; and four sisters of decedent's wife. Not more than $200 a month was to be paid to any of said persons. Any surplus above the sum of $200 per month was to be paid to the McKinley Industrial Home Society of Los Angeles, and at the termination of the trust upon the death of all beneficiaries, the said residue was to go to said society, for the benefit of the McKinley Home for boys. The will also contained a provision for the forfeiture of the legacy of any person who should institute any contest thereof.

On its face said will furnishes no indication of being the product of a disordered mind, but, rather, would appear to be the well thought out and carefully considered scheme of a highly rational person, conscious of a duty to society to assist in the maintenance of its weaker members, desirous

of showing his appreciation of loyalty and devotion given him by a business associate and faithful secretary, and mindful of the welfare of members of his own and his wife's family. The fact that he placed the claims of his wife above those of the other legatees, by limiting the above provisions to take effect only in the event that his wife did not survive him, does not render the will unnatural, especially in view of the circumstances of the parties and the relationship between decedent and his brothers and sisters, as indicated by the evidence offered on behalf of contestants.

Decedent started out in the jewelry business in Green Bay, Wisconsin, some time after 1887, with a small capital of $2,000, partially borrowed from his mother and sisters and partially from other sources. In 1890 he married respondent, whom he had known from childhood. It appears that she assisted her husband in conducting his business. The business proved prosperous and several years later was sold. They left for Los Angeles, California, with approximately $30,000, and there entered into the jewelry business from which decedent amassed his fortune. The other members of the family all remained in either Wisconsin or Illinois. There is little evidence in the record as to the relationship between John Luckenbach and his brothers and sisters between the time he left for California and 1911. After that date it appears that he visited members of his family whenever his business required his presence in the Middle West and when going on or returning from trips to Europe with his wife. He saw them in 1911, 1913, 1916, and 1917. Decedent's relation with his brothers and sisters was friendly and cordial, but there is no evidence in the record tending to show that their affections were exceptionally deep-seated or any greater than that which exists between brothers and sisters who have been long separated and meet infrequently. None of contestants saw decedent after 1917, which was seven years before the execution of the will and nine years before his death, and no regular correspondence appears to have been carried on with any of the brothers and sisters. Simon Luckenbach testified that he had not seen decedent nor heard from him through the mails since 1911. Anton last wrote in 1919, asking him if he would make him a loan of $5,000, but received no reply.

The state of health and financial condition of certain of the brothers and sisters is relied upon as rendering unnatural the disposition of the testator's property to his wife to the exclusion of said brothers and sisters. The youngest was fifty-four and the oldest over seventy years of age, and all, with the possible exception of Anton, seem to have possessed very limited means. Mary O'Brien, one of the contestants, testified to a visit with decedent in Chicago in 1917, at which date she was working to support herself, in the course of which she and decedent discussed the fact that she was afflicted with rheumatism and decedent told her that when she was no longer able to work he would take care of her. In 1919 she married and at the date of the execution of the will she was being supported by her husband. Contestant Simon, a shoe salesman, was a sufferer from stomach trouble when decedent saw him in 1911. Decedent suggested that if he would go up in Masonry he would assist Simon financially. Contestant Katherine Piraux had been supported by her adult sons for many years, as had Margaret Woelz, one of the sisters who did not join in the contest.

For many years before his death decedent had regularly sent monthly remittances to his sisters Anna and Josephine and to his oldest brother, William. He also paid Josephine's funeral expenses. At the date of his death and for some time prior thereto he was contributing $50 per month to Anna and to William, and upon several occasions during his visits he had given Mary O'Brien, then Mary Luckenbach, gifts of money. Other contributions to the support of said brothers and sisters seem neither to have been received nor expected. Anna and William, who were the chief recipients of decedent's bounty during his lifetime, have not joined in the contest. The facts show that distance and the lapse of time had gradually weakened any intimacy or close association existing between the decedent and the members of his family. ■ We cannot declare a testamentary disposition unnatural because the testator leaves his entire estate to his wife, who has been his companion for thirty-six years, to the exclusion of brothers and sisters whom he had not seen for many years preceding his death and with whom he had carried on no regular correspondence.

Although there is absolutely no evidence in support of the allegations of contestants' petition that Mrs. Luckenbach promised to provide for her husband's brothers and sisters, the testator may well have acted with the expectation that she would do so. It appears in evidence that the monthly checks to Anna, William, and Josephine were frequently signed by Mrs. Luckenbach, and that if letters accompanied the checks they were written by her. It further appears from the testimony of contestants that Mrs. Luckenbach continued to make the monthly payments after the death of her husband until the will contest was instituted. Contestants offered as evidence directed to the allegation of undue influence an incident related by contestant Mary O'Brien to the effect that in a stealthy manner decedent handed her a $20 bill as he was leaving Chicago in 1911, at the depot, when Mrs. Luckenbach was ahead of them and in a position where she could not see the bill passed. Said incident is practically of no value in view of evidence as to Mrs. Luckenbach having joined her husband in extending aid to his relatives, and the further testimony of Mary O'Brien herself that Mrs. Luckenbach was aware of the gifts made by her husband and had mailed money to Mary O'Brien before the marriage of said Mary O'Brien.

Nor are the remarks of the testator to said Mary O'Brien in 1917 as to his intention to provide for her when she was no longer able to work, nor the further statement, made in 1917, testified to by Anton Luckenbach, that he would provide for his brothers and sisters and not work for the "other fellow," when given the fullest effect possible, sufficient under any analysis of the facts, considered either alone or together with the other circumstances relied upon, to sustain a finding of fraud or undue influence.

A few isolated and detached, trivial and inconsequential incidents, happening at a time remotely distant from the date of the execution of the will, are to be given little weight in considering the mental status of the person under investigation or the further testamentary essential, freedom of action.

There remains only to consider the provision of the testator's will in regard to Edith Luckenbach. As stated above, said provision bequeathed $10,000 to a trustee to pay

the income to Edith Luckenbach *"for her education, the disbursement thereof to be directed by my said trustee, and after she has attained the age of eighteen years,* to pay said net income to her during her natural life." (Italics supplied.) At the time of the execution of the will Edith Luckenbach was thirty-five years of age and had finished her education in the ordinary sense of the term. She had visited the decedent a few months before the will was drawn. Contestants argue that the inclusion of this provision indicates that the testator must have believed said Edith to be at least seventeen years younger than she actually was and that such a belief reveals unsoundness of mind incompatible with testamentary capacity. They further argue that it is reasonable to infer and must be inferred, in considering the propriety of the nonsuit, that believing Edith Luckenbach to be younger than she actually was, the testator insanely believed all his relatives to be younger than their years and possessing the added strength and capacity to support themselves which youth would be likely to give them. We are unable to accede to the view that such extravagant inferences have any place in the determination of legal rights, even in considering the propriety of a nonsuit. The said provision is contained in a portion of the testator's will in which he creates trusts for three other persons, the income to be paid for their education until they shall attain the age of either eighteen or twenty-one years. The phraseology of the provision for Edith Luckenbach is practically identical with that of the other trust provisions. The will is a lengthy document, and apparently was drawn by an attorney. The only reasonable inference which may be drawn in view of all the circumstances, even in considering whether a nonsuit should have been granted, is that the inappropriate language, which, however, would not affect the validity of the provision or the rights of Edith Luckenbach thereunder, inadvertently crept into the instrument and either was not noticed by the testator, or was not deemed by him of sufficient importance to be changed. Nor does the testimony of the witness Palmer affect our conclusion.

The testator was only about fifty-eight years of age at the date of his death. Absolutely no evidence was intro-

duced to support the allegations of the petition that decedent, for ten years immediately preceding his death, was afflicted with disease of mind and body. There is a reference to an eczema on his hands with which he was afflicted at times, but otherwise not a shred of evidence that at the time of his death or at any other time he suffered with any disease whatsoever. Absolutely no evidence as to improper execution of the will or proof relating to the charge that it was forged was attempted to be introduced. Nor was any evidence introduced in support of the allegations of the petition charging Mrs. Luckenbach with undue influence in stating to her husband that his relatives were anxiously awaiting his death to obtain and squander his property and making other false statements. Rather, the proof would indicate that she was well disposed toward said relatives.

The evidence relied upon is wholly insufficient to support an adjudication pronouncing said will invalid. As this court said in *Estate of Bryson,* 191 Cal. 521 [217 Pac. 525] : "Adopting, as we must, the rules of construction that apply to cases of nonsuit, by indulging every favorable inference fairly deducible and every favorable presumption fairly arising from the evidence, and giving to contestant the benefit of every piece of evidence which tends to sustain his averments, as fully stated in *Berger* v. *Lane,* 190 Cal. 443 [213 Pac. 45], and cases cited, it is clear that he has completely failed to make out a *prima facie* case. The rule of law is that fraud must be proved and cannot be presumed, and its application to the facts of this case is sufficient alone to defeat contestant's case. The inferences and presumptions spoken of above must fall within the realm of rationality. There is nothing in contestant's case which amounts to more than mere conjecture, surmise, or suspicion. To justify the submission of any question of fact to a court or jury there must be proof of a *substantial character* that the fact is as alleged." If the court below had refused to grant a nonsuit and the will had been declared invalid, on the basis of the evidence here offered, we would be required to reverse the judgment on appeal, as being against the law. This being the case, the judgment of nonsuit must be affirmed. (*Estate of Unger,* 188 Cal. 714 [206 Pac. 1003] ; *Estate of Wall,* 187 Cal. 50 [200 Pac.

929]; *Estate of Chevallier*, 159 Cal. 161, 168 [113 Pac. 130]; *Estate of Morey*, 147 Cal. 495, 502 [82 Pac. 57].) The judgment appealed from is affirmed.

Shenk, J., Preston, J., Langdon, J., Curtis, J., and Waste, C. J., concurred.

Rehearing denied.

All the Justices present concurred.