[Civ. No. 12525.   Second Dist., Div. One.   Aug. 4, 1941.]

WM. H. NEBLETT, Appellant, v. JOHN B. ELLIOTT et al.,
Respondents.

William C. Ring, E. Walter Guthrie, E. W. Miller, J. Merrill Brown, R. Dean Warner and Alfred F. MacDonald for Appellant.

Mayock & Lester, Gordon Lawson, Joseph L. Lewinson and Donald Armstrong for Respondents.

WHITE, J.—In an action to recover damages for libel, the plaintiff charged that the defendants, pursuant to a conspiracy theretofore entered into, caused to be written and published a false and defamatory statement of one Carl Pustau wherein plaintiff, an attorney-at-law, was accused of corruptly influencing or attempting to influence certain high officers of the United States Government. Upon the trial a judgment of nonsuit was entered in favor of each of the defendants and respondents herein John B. Elliott and Ralph B. Gordon. From such judgments this appeal is prosecuted.

So far as the factual background here involved is concerned, and stating the same in the light most favorable to plaintiff, as we are required to do on appeal from a judgment of nonsuit, it appears from the record that on October 22, 1937, one Walter Hearn, a friend of defendant Peirson M. Hall, brought defendant Carl Pustau to Mr. Hall's law office. On the day following, after talking with Mr. Pustau, defendant Hall telephoned defendant John B. Elliott, inviting the latter to come to his office. Upon Elliott's arrival at Hall's office, the latter in the presence of Pustau told Elliott the story related to him by Pustau and advised Pustau to reduce his story to writing and to keep whatever documents in the form of checks, receipts, etc., he had in his

possession which would substantiate his narrative. At this meeting Hall suggested that Pustau obtain the services of defendant J. E. P. Dunn, a licensed investigator and detective, to assist Pustau in preparing his written statement and the assembling of such papers as he had which would substantiate his story. Responding to a telephone call from defendant Hall, defendant Dunn came to the former's office, where he met defendants Pustau, Elliott and Hall, and the latter again related what had been told him by Pustau. Ultimately, arrangements were made to employ defendant Dunn at an agreed compensation, payment of a portion of which at least was guaranteed by defendant Elliott. After several days of association with Pustau, defendant Dunn, with the approval of defendants Elliott and Hall, employed a stenographic reporter, and on the 8th and 9th days of November, 1937, in a hotel room in Los Angeles, the "Pustau statement" was obtained. This statement was in the form of a civil deposition and was a typewritten transcript of the shorthand notes of the stenographic reporter made in recordation of conversations between Dunn and Pustau on the days mentioned. A few days thereafter, an original and two copies of the same were delivered to defendant Dunn by the reporter. In the latter part of November, 1937, defendant Dunn submitted a statement covering his services and expenditures to Elliott, which the latter paid.

It further appears that on October 23, 1937, defendant Gordon, who was a friend of defendant Dunn, had lunch with him. At this luncheon Gordon inquired of Dunn whether he could arrange a meeting between Gordon and the racing commission, a representative of each California track, and the governor of the state or one of his representatives. A few days thereafter defendant Dunn called defendant Gordon and told him he knew a man who said he could put Gordon in contact with the persons he wanted to see, and on November 4, 1937, defendant Dunn took Pustau to Gordon's home, at which time Gordon stated to Pustau whom he wanted to meet and outlined to the latter why he desired to meet the people in question. Defendant Gordon told Pustau he could not pay him for his services, but that if Pustau helped him to make his plans successful he would reward him with a percentage of the profits. Defendant Pustau advised Gordon that he would think the matter over, and on November 8 de-

fendants Pustau, Gordon and Dunn met in the latter's office, where Pustau consented to assist Gordon. It further appears that at this meeting Dunn told his friend Gordon he did not know what kind of man Pustau was, or how much Gordon could rely upon him. Subsequently Gordon saw Pustau quite frequently, but notwithstanding Dunn's admonition not to advance too much money to Pustau until he had produced some results, it appears that nevertheless by the end of December, 1937, Gordon had advanced Pustau the sum of $764.50.

Early in the following year Gordon met Pustau and demanded return of the money he had advanced him, telling Pustau the latter had produced no results, had been very dishonorable and had related many things that were untrue. The evidence seems also to indicate that defendant Dunn never told Gordon that he was investigating Pustau or of the existence of the "Pustau statement."

On February 3, 1938, defendant Gordon went to defendant Hall's office and told him he wanted to sue Pustau for the money he had advanced. The attorney advised him that the best way to handle the matter would be to institute involuntary bankruptcy proceedings against Pustau, but advised Gordon that he could not handle the case. However, he mentioned the names of several attorneys who might be willing to handle the matter, and defendant Gordon finally selected defendant Welburn Mayock, whereupon attorney Hall telephoned Mayock's office, as a result of which Mayock came to Hall's office on the day following, when Hall asked Mayock if he was in a position to handle a bankruptcy matter in which a United States senator as well as a nationally known banker might appear in an unfavorable light. Mayock replied that he did not know the gentlemen and was unaware of any impediment to his handling the matter. Defendant Hall informed Mayock he would call the party in question and tell him to make an appointment, and also advised Mayock that the name of the alleged bankrupt was Pustau, who might deny that he had any assets. Hall further told Mayock he had in his possession a statement in which Pustau disclosed certain assets, and gave a copy of the "Pustau statement" to Mayock, which the latter read, and on the following Sunday defendant Gordon went to Mayock's office and told him he had lent $764.50 to Pustau, of which sum $250 had been returned to him through defendant Dunn.

On the next day, Monday, February 9, 1938, attorney Mayock prepared and filed a petition in involuntary bankruptcy and obtained an order of the United States District Court for the Southern District of California for the appearance of the alleged bankrupt, Pustau, on the following day before the Honorable Benno Brink, referee in bankruptcy, who was appointed to conduct, as special master, a hearing concerning the acts, conduct or property of Pustau; said hearing being held pursuant to section 21 (a) of the Bankruptcy Act. Defendant Gordon paid Mayock the sum of $30 as a fee for filing the petition, and compensated the notary for the latter's charges, but, so far as the record discloses, did not pay or agree to pay Mayock an attorney's fee for his services, because attorney Mayock advised that his fee would be a preferred claim in the bankruptcy proceedings.

Prior to the bankruptcy hearing Mayock did not tell Gordon that he had a copy of the "Pustau statement" or that he might use it at the bankruptcy hearing. He did tell Gordon that his presence was unnecessary at the hearing, and Gordon was not in attendance. During the next succeeding few days Mayock consulted Hall on several occasions.

On the morning of February 10, 1938, Pustau called Dunn and told him he had been served with a subpoena commanding his appearance in the bankruptcy court at ten o'clock, and asked Dunn what he should do. The latter advised him to obey the subpoena and suggested it would be appropriate for him to ask a continuance for the purpose of securing counsel. Pustau appeared at the hearing and requested a continuance, which was granted over Mayock's objection that a witness was not entitled to counsel. The hearing was continued until two o'clock the following day. Following the granting of the continuance Pustau met Dunn, who suggested he employ defendant J. J. Irwin as his attorney to represent him in the bankruptcy matter. Pustau did employ attorney Irwin, who called attorney Mayock and invited Mayock to his office. At the hearing on February 11, 1938, attorney Mayock called Pustau to the witness stand and inquired briefly into the various transactions related in the "Pustau statement." During this interrogation Pustau orally made several changes in his statement. After asking Pustau a few questions, attorney Mayock offered the "Pustau statement" and certain exhibits in connection therewith in evidence, and they were

so received by the special master, attorney Irwin making no objection to their introduction. Attorney Mayock testified that he offered the statement into evidence to accommodate attorney Irwin, who had requested that he make the hearing brief, and also for the purpose of confronting Pustau with a statement of his assets and liabilities. Attorney Mayock testified also·that at the time he offered the statement at the bankruptcy hearing he did not believe a legal action could be brought to recover the sums which Pustau claimed in his statement were owing to him, because of the alleged illegal nature of Pustau's activities upon which he based his claims.

On the evening of February 13, 1938, in the lobby of a Los Angeles hotel, defendant Dunn met a newspaper reporter, and in response to the latter's question, "What's new?" Dunn told him of the existence of the "Pustau statement" in the bankruptcy court and outlined to the reporter its general content. On the following morning the newspaper reporter went to Hall's law office and asked the latter if he had heard of the "Pustau statement." Hall replied in the affirmative, and referred the reporter to attorney Mayock for a copy. When approached by the reporter for such copy, attorney Mayock told him he did not have a copy, and suggested that the reporter go to the bankruptcy court and look at it. Upon arrival at the bankruptcy court the reporter was informed that upon orders of Referee Brink the "Pustau statement" could not be seen. This information the reporter conveyed to Mayock, whereupon the latter went to Hall's office and obtained a copy of the statement and a copy of the exhibits in connection therewith, after which he went to the office of the bankruptcy court reporter to obtain a transcript of the proceedings. The bankruptcy court reporter told Mayock that Referee Brink had suppressed his notes. Attorney Mayock thereupon prepared a written demand for a transcript of the proceedings and served it upon the court reporter and Referee Brink. This took place around noon on the 14th of February. It further appears that later that afternoon attorney Mayock was informed by the newspaper reporter that the latter had heard that the referee was going to expunge the "Pustau statement" and exhibits in connection therewith from the record.

Following his appearance at Referee Brink's office, Mayock and the newspaper reporter went to a public stenographic

service in Los Angeles and ordered eight or nine copies of the "Pustau statement" typed. Subsequently Mayock delivered a copy thereof to the newspaper reporter. After a conference with defendant Hall, Mayock decided to give copies of the statement and the exhibits used in connection therewith to all the metropolitan newspapers, and thereupon he took copies of the exhibits to a photostatic service and ordered photostatic copies thereof. On the evening of February 14, about six o'clock, defendant Mayock returned to the photostatic service and obtained the photostatic copies, for which he paid thirty or thirty-five dollars. Assembled at the photostat service office were various newspaper reporters and defendants Hall and Mayock. When the latter received the photostats he distributed the copies of the statement and the photostats to the assembled reporters. The distribution of the copies of the statement and the photostatic copies of the exhibits in the office of the photostatic service, as above narrated, is the publication of which the appellant complains and upon which his cause of action was grounded.

By his second amended complaint (hereinafter referred to as the complaint) plaintiff alleged that he was at the time of the filing thereof and ever since October, 1919, had been duly admitted and licensed to practice as an attorney-at-law in all the courts of the State of California, and until September 1, 1937, was a law partner of then United States Senator William G. McAdoo; that as such attorney-at-law plaintiff came to and did enjoy a good name and a widespread and enviable reputation. It is then alleged that during the year 1937, prior to the filing of said complaint, the defendants wilfully, unlawfully and maliciously conspired, confederated and arranged and agreed together and with each other to maliciously and wantonly injure and defame the plaintiff in his name and reputation; and that in pursuance and furtherance of the objects of said conspiracy the defendants caused to be published certain defamatory statements of and concerning the plaintiff, and which said statements were contained in the "Pustau statement" heretofore referred to. Without here setting forth in detail such statements, the complaint alleged that by the publication of portions of the same it was meant and understood by persons to whom the statement was published to mean that plaintiff had agreed to accept the payment of a substantial sum of money from the

George A. Fuller Construction Company of New York, and that all or a portion of such money would be paid by plaintiff to United States Senator McAdoo as a bribe for the purpose of corruptly influencing the Senator in obtaining an increase in the allotment of $900,000 for the emergency deficiency bill, to the end that said construction company would be awarded the contract for the erection of the post office in the city of Los Angeles; that by certain other language and words contained in the published statement, it was meant and understood to mean by the persons to whom said statements were communicated, that plaintiff had requested Pustau to make a trip to Washington for the purpose of changing a certain congressman's attitude toward a branch banking bill then pending in Congress, so that such congressman would be in favor instead of against it; and further, that plaintiff had authorized said Pustau to pay the sum of $5,000 to such congressman as a bribe for casting his vote in favor of a certain bill then pending in the House of Representatives. It was further alleged that certain language contained in the published statement was understood by persons to whom such statements were published to mean that defendant Pustau, at the request of plaintiff, gave the latter a check for $2,000 to be used for the purpose of corruptly influencing plaintiff's law partner, Senator McAdoo, to have a corporation known as the R. E. McKee Company declared to be the low bidder on a new building to be erected by the Veterans Hospital at Sawtelle, California. Finally, it was alleged that certain other statements contained in the "Pustau statement" meant and were understood to mean by persons to whom they were communicated that plaintiff had made arrangements with Pustau whereby Pustau would give to plaintiff the sum of $6,000 for the purpose of delivering that sum to plaintiff's law partner, Senator McAdoo, as a bribe to corruptly secure the appointment of a certain person as the California Administrator of the Works Progress Administration.

Although there were four causes of action contained in plaintiff's complaint, the cause was tried only upon the fourth cause of action therein contained, which charged a conspiracy among the defendants to libel appellant. The first three causes of action were dismissed prior to the taking of testimony, and no appeal was taken from said judgments of dismissal. At the conclusion of plaintiff's case all defendants

(except Pustau, who did not appear at the trial either in person or by counsel) made motions for nonsuit, and the same were granted as to defendants John B. Elliott and Ralph Gordon, but denied as to the other defendants, Dunn, Mayock and Hall, whereupon the trial proceeded as to all defendants except Elliott and Gordon. This appeal concerns only the judgments predicated upon the nonsuit granted to the last-named defendants.

Appellant's contention as to what the evidence shows is thus epitomized by him in his brief: "That Elliott and Hall, motivated by the desire to defeat the re-election of Senator McAdoo, and assisted by Dunn, bought the Pustau Statement from Pustau; that they attempted to publish it with the assistance of Gordon, Dunn, Mayock and Pustau by means of a collusive bankruptcy proceeding; that this plan was thwarted when the newspaper reporters were denied access to it; and that with the knowledge that the bankruptcy court had suppressed the further publication of the Pustau Statement and was going to expunge it from the records, they obtained copies of the Pustau Statement and distributed them to the newspaper reporters."

Respondents on this appeal take no issue with appellant in his claim that the language contained in the published statement is actionable *per se* and was not published on a privileged occasion; but they contend that, conceding the existence of a conspiracy to defame appellant, neither of them ever joined or knowingly participated therein.

We shall first give consideration to the evidence so far as it purports to show, as claimed by appellant, that the respondent Elliott knowingly participated with others, as charged, in the alleged conspiracy, or in the arrangements made to publish the defamatory statement, for the purpose of maligning and reflecting upon appellant's reputation. It is only when plaintiff can show that a defendant has united or cooperated with others to inflict a wrong upon him that he is entitled to a joint recovery of damages against such defendants. (*More* v. *Finger*, 128 Cal. 313 [60 Pac. 933]; *Nevin* v. *Gary*, 12 Cal. App. 1 [106 Pac. 422]; *Herron* v. *Hughes*, 25 Cal. 555.) To accomplish this, plaintiff must show (1) concert of action between Elliott and the other defendants to accomplish the purpose of the conspiracy, i. e., the publication of the libel; (2) that respondent's actions were illegal

and in furtherance of a common scheme or design to achieve the unlawful purpose of the conspiracy; and (3) that respondent had knowledge of the conspiracy and its unlawful purpose. (*Angelus Securities Corp.* v. *Ball,* 20 Cal. App. (2d) 423, 432 [67 Pac. (2d) 152]; *Fisher* v. *Myers,* 339 Mo. 1196 [100 S. W. (2d) 551].)

As to respondent Elliott, there is in the record evidence that in 1932 he was manager of the successful campaign of Senator McAdoo for the office of United States Senator, but vigorously opposed the re-election of the senator in 1938; that he paid defendant Dunn some $800 for the latter's services and expenses in obtaining and delivering an original and two copies of the Pustau statement to defendant Hall. The record is barren of any evidence that respondent Elliott ever knew of any plan or scheme to wrongfully publish the "Pustau statement" or that he in any way participated in obtaining it other than to enable him to investigate and verify, if possible, the truth of Pustau's assertions concerning the activities of appellant and his law partner, Senator McAdoo. The record indicates that at no time was respondent Elliott aware of the subsequently established perfidy of Pustau. A reading of the record further discloses that the plan to publish the "Pustau statement" was initiated in February, 1938, and it is noteworthy in that connection that respondent Elliott's name is not mentioned by any witness in the case with reference to events occurring subsequent to the latter part of November, 1937. There is an utter lack of evidence that respondent Elliott knew anything about the Pustau bankruptcy proceedings or of the delivery of the "Pustau statement" and exhibits to the newspapers. It is true that each participant in a civil conspiracy is responsible as a joint tort-feasor for all damages resulting from the wrong, irrespective of whether he was a direct actor and regardless of the degree of his activity; but the evidence herein is wholly unsatisfactory to show that the conduct of respondent Elliott was in furtherance of a common agreement or understanding to attain the claimed unlawful purpose of the persons who undertook to and did publish the alleged libel. Such a showing is indispensable, but here is entirely lacking.

Appellant places great reliance upon certain of his own testimony given at the trial wherein he testified that subsequent to the filing of the libel suit here in question he had a

conversation with respondent Elliott at appellant's office, no other person being present. As to what occurred on this occasion, appellant testified in part as follows:

"Mr. Elliott, after we sat down and exchanged a few more or less nonessential statements, said that he wanted me to dismiss this libel suit against him. He said, 'You and I have been old friends and have known each other socially well all these years, and I don't think you ought to sue me.' Quite a bit of discussion was had along that line, and I replied, 'I don't know what else I could do, Jack. Here I am practicing law in Los Angeles, not bothering you or anybody else, getting along all right, and you come along and publish against me a statement of Pustau, which it now develops that you bought and paid for and put out against me, which charges me with crimes of pretty nearly every nature in the calendar, and which, if true, I would not only be disbarred, but would go to the penitentiary. I cannot see any basis on earth why I should dismiss against you, and I cannot see any basis why you should come over here and ask me to do so.' I said, 'Every day since you have known me all these years I have been at your house and you have been at my house. We have been that sort of friends. We have done everything together.' I said, 'During the time we lived at the beach you lived just a little way from me.' I said, 'You were at my house nearly every day and all the time we were seeing each other last summer you were working up against me this Pustau statement at that time.' And I said, 'I cannot forgive you for it, and when you got it you should not have published it. You should have seen me and asked me whether it was true. You owed me that much. You owed it to me to give me a chance to tell you what my side of it was before you sprung it on the public, and it ruined me as a practicing attorney in this city. It ruined me from every standpoint, and I cannot see why you should do it.' *He said, 'I was not after you; I didn't intend to hurt you; I was not trying to get at you at all. I had made up my mind that McAdoo ought not to be in there, and I could not publish things on McAdoo without putting them out on you.' . . .*"

Cognizant as we are of the rule applicable to motions for a nonsuit—that the evidence must be viewed with reasonable favor in support of plaintiff's case and taken most strongly against the defendant (*Nicholas* v. *Jacobson,* 113 Cal. App.

382, 387 [298 Pac. 505]), nevertheless, we are not required to accept as true everything that is testified to by the witnesses, and neither is the trial court. As was said in *Nicholas* v. *Jacobson, supra*:

" . . . Words may be mere words in the testimony, but evidence 'is the means, sanctioned by law, of ascertaining in a judicial proceeding the truth respecting a question of fact.' (Code Civ. Proc., sec. 1823.) One of the 'means sanctioned by law' is to have the witness appear and give his testimony orally, but it has frequently been held that a court is not bound to accept oral testimony as evidence of a fact if such testimony is inherently improbable. (*Davis* v. *Judson,* 159 Cal. 121, 130 [113 Pac. 147]; *Caldwell* v. *Weiner,* 203 Cal. 543, 546 [264 Pac. 1100]; *Staples* v. *Hawthorne,* 208 Cal. 578, 583 [283 Pac. 67].) Such is the case here. It is not the habit of normal men to submit to medical or surgical treatment unless they have some physical ailment, or, at least, unless they think they have such ailment. Hence, the mere statement of the appellant made seven years after the occurrence that he did not have any physical ailment when he consulted the respondent and that he did not ask the respondent for medical treatment must be rejected as evidence by the common sense of mankind. But we do not mean to hold that the trial judge may pass on the credibility of a witness in ruling on a motion for nonsuit. We merely hold that this particular testimony is so inherently improbable that it was not entitled to consideration as evidence in the case, and that, if a verdict for the plaintiff should have been founded on it such verdict would have had no support as being against the law. (*Estate of Luckenbach,* 205 Cal. 292, 301 [270 Pac. 961, 965], where the court took the following quotation from *Estate of Bryson,* 191 Cal. 521, 541 [217 Pac. 525], adding the emphasis noted: 'To justify the submission of any question of fact to a court or jury there must be proof of a *substantial* character that the fact is as alleged.') "

To us it seems incredible and contrary to the normal conduct of men that respondent Elliott, after being served with a complaint whereby appellant sought a million-dollar judgment against him, would admit the whole question in controversy between him and appellant to be against himself. The trial court was therefore warranted in rejecting such testimony as inherently improbable. We are not unmindful

of the fact that jurors are the sole judges of the facts, but the question as to whether there is *substantial* evidence in support of the plaintiff's case is in all instances a question of law for the court. (*Herbert* v. *Lankershim,* 9 Cal. (2d) 409 [71 Pac. (2d) 220].)

Bearing in mind the rules just enunciated, we come now to a consideration of the evidence so far as it relates to the conduct and actions of respondent Ralph Gordon. In that connection the record discloses that Gordon had been for some years a friend of ·defendant Dunn. During October, 1937, he advised his friend Dunn of his desire to effect a contact with members or representatives of the racing commission and others. Defendant Dunn introduced Gordon to Pustau, the latter of whom pretended he could assist Gordon, and received from Gordon sums totaling approximately $764.50 as loans or compensation. Subsequently some of this money was repaid Gordon, and thereafter the latter discovered that Pustau was unable to bring about the desired introductions, whereupon Gordon made unsuccessful efforts to retrieve his financial advancements to Pustau. He consulted defendant attorney Hall, who advised of his unwillingness to accept the professional employment, but proffered Gordon a list of attorneys, from which Gordon selected attorney Wilbur Mayock, one of the defendants herein. The latter accepted the employment from Gordon; and because no tangible assets belonging to Pustau were known, defendant Hall suggested that proceedings in bankruptcy be instituted, wherein Pustau would be required to disclose all his assets. Attorney Mayock obtained from respondent Gordon the necessary information and data, and filed the bankruptcy action as aforesaid. At no time did Mayock mention to Gordon the "Pustau statement", and Gordon did not attend the bankruptcy hearing. The record discloses neither motive nor reason for respondent Gordon to join any conspiracy to malign appellant and contains no testimony that such respondent knew of the existence of the statement, its introduction into evidence at the bankruptcy hearing, or of the intentions of any person or persons to deliver, or of the actual delivery of, copies of such defamatory statement to the newspapers. We cannot roam in the fields of suspicion, conjecture and surmise to stigmatize respondent Gordon with guilty knowledge and wilful intent to injure appellant.

Therefore, under familiar rules, the action of the trial court in granting a nonsuit as to respondent Gordon must be upheld, because if a verdict for plaintiff had been found against respondent Gordon on the state of the record here presented, such verdict would have had no support in the evidence and consequently would have been against the law.

The attempted appeal from the order granting the nonsuits is dismissed. For the foregoing reasons, the judgments from which this appeal is taken are, and each is, affirmed.

York, P. J., and Doran, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied October 2, 1941.