[Civ. No. 18753.   First Dist., Div. One.   May 11, 1960.]

RONALD BELL, Appellant, v. HARVEY M. HUSON, Respondent.

Lange & Rockwell for Appellant.

Pelton, Gunther, Durney & Gudmundson and Thomas M. Kearney for Respondent.

TOBRINER, J.—This appeal arises from a personal injury action in which appellant obtained a verdict and resulting judgment for $5,000. Thereupon the trial court, although it had denied previous motions for a nonsuit and directed ver-

dict, granted respondent's motion for judgment notwithstanding the verdict "since it . . . is this Court's opinion that there was no substantial evidence upon which the verdict can stand. . . ." Denying respondent's alternate motion for a new trial, the court also stated that if "such decision to grant judgment notwithstanding the verdict is not affirmed in the event of appeal" the court did not intend "to require a new trial of the matter but . . . to permit the verdict to stand. . . ."

We believe the judgment should be sustained despite appellant's two grounds of appeal. Appellant initially contends that the jury impliedly found that he had the right of way since he first entered the intersection and that the accident consequently resulted from respondent's negligence. This argument leads to the question as to whether the accident did occur in an intersection as defined by Vehicle Code, section 86 (now § 365). Appellant secondarily submits that the jury found by implication that respondent failed to avail himself of the last clear chance to avoid the accident.

The action arose out of a motorcycle-automobile collision at Bernal Heights Boulevard and Folsom Street on February 18, 1957. Bernal Heights Boulevard encircles Bernal Heights, and Folsom Street intersects with the boulevard at an upgrade.

Appellant proceeded on Bernal Heights toward Folsom Street; just before the curve on Bernal, he shifted gears on his motorcycle, the throttle stuck and the cycle accelerated to 30 miles per hour. With the cycle out of control, appellant left the boulevard, cutting into the shoulder of the road, swerving back onto Bernal. Having noted that the fence on the opposite side of Folsom Street was not too strong and that the area behind it was level and covered with tall weeds, appellant intended to go through the fence "and that would slow me down." In his effort to control the cycle appellant stood up and did not sit upon the seat. He could not apply the brakes.

At this point appellant saw respondent's car at a point considerably down Folsom Street, which he marked on appellant's Exhibit 12 as "B-5."* Appellant stated: ". . . I tried to stay more to the left, but it just wouldn't go, it was too sharp a turn. I kept going directly ahead because I was

---

*We shall refer to the points marked on appellant's Exhibit 12, since they most effectively demonstrate such locations. We regret that a reproduction of this very large exhibit is not feasible, but it may be examined as part of the records of the case.

almost out of his path, almost through the intersection, and in my mind I figured by the time he was anywheres near me I would be completely away from him." Appellant testified that respondent's car hit the rear portion of the cycle at a place designated on appellant's Exhibit 12 as "B-6."

Respondent, prior to the collision, proceeded at 15 to 20 miles per hour up Folsom Street toward Bernal Heights, intending to turn right onto Bernal. Before the impact, respondent saw the appellant "as he shot across the crest of the hill." "I was about 50 feet below the crest of the hill." Respondent stated that when he observed appellant he took his foot off the accelerator, but was unable to depress the brake pedal before the collision. In his deposition respondent said, "[B]etween the time I seen him and the time of the collision was approximately a couple or three seconds."

Mr. Parker, a passenger in a car, which, travelling on Bernal Heights, had just turned left onto Bernal from Folsom Street, observed appellant shooting past, looking "like he might be half standing on his motorcycle as if he was trying to brake it." The driver of the vehicle, Hogate, observing the cyclist's facial expression, realized that appellant was in trouble. Hogate testified that he "glanced through the rearview mirror just in time to see [appellant] . . . going over the hood into the air." At this instance, "it looked . . . like the car had just got his nose up to the top of the hill." Hogate fixed the point of collision just slightly downward from that described by appellant, a point he apparently marked as "HL 3" in the exhibit, but which is designated as "LH-3" in the transcript. While Hogate also marked appellant's photographic Exhibit 11 as to the location of the respondent's car at the time, the witness remarked upon the inadequacy of that photograph to depict the place in its proper perspective: "Q. Is that the spot, sir? A. Yes. Well that makes it look like he went over the center. . . . He was coming up on the right-hand side of the pavement just entering the intersection. . . . This is downhill from here down. . . ."

San Francisco Police Officer Burke investigated the accident and from the statements of both parties, the debris and skid marks, he designated as the point of collision "RB-1" on Exhibit 12, which was slightly above the point designated by appellant. The officer stated, "It was located 9 feet north of an extension of the southerly lines of Bernal Heights, extension of the curb line of Bernal Heights." Burke also testified that Bernal and Folsom intersect at approximately 55 degrees;

that the normal reaction time for an average person is three-quarters of a second; however, in response to appellant's question as to the stopping distance at 15 miles per hour, he stated that it is impossible to answer such a question unless it is more precise in terms of all the variable factors. Upon being asked to designate the "curb lines . . . on these two streets" he drew a green line on appellant's Exhibit 12 which was farther south than the point of collision described by appellant, Hogate or respondent.

A witness for the respondent Saulsbury, whose car was parked in the Bernal Heights parking area, testified that the motorcycle "went past . . . three times" and the accident happened on the "third time around"; that on this occasion "[h]e [appellant] attempted to go down Folsom Street"; that the impact occurred at a point which the witness marked as "S-3" on the exhibit, a point which is farther down Folsom Street than the point of impact as marked by appellant, and that this point was "[a]bout twenty feet" from the crest of the hill.

We turn to the first issue: whether respondent violated appellant's right of way by proceeding negligently through the intersection.

In testing this issue we are guided by the rules pertaining to the granting of a judgment notwithstanding the verdict. That test must be that the motion " '. . . may properly be granted only when, disregarding conflicting evidence and indulging in every legitimate inference which may be drawn from plaintiff's evidence, the result is a determination that there is no evidence sufficiently substantial to support the verdict.' (*Devens* v. *Goldberg* (1948), 33 Cal.2d 173, 177-178 [199 P.2d 943].)" (*Champion* v. *Bennetts* (1951), 37 Cal.2d 815, 820 [236 P.2d 815].) To the same effect: *Neblett* v. *Elliott* (1941), 46 Cal.App.2d 294, 305 [115 P.2d 872].

Section 86 of the Vehicle Code (now § 365) defines "intersection" as "the area embraced within the prolongation of the lateral curb lines, . . . of two highways which join one another at approximately right angles or the area within which vehicles traveling upon different highways joining at any other angle may come in conflict." The pictorial exhibits and testimony indicate that Bernal and Folsom intersect at an angle other than 90 degrees.

While the original determination of the area which comprises the intersection is a question of fact, the jury's resolution of the issue cannot stand if no evidence substan-

tially supports it. When we turn to the record we find that, according to all the witnesses, the accident occurred at a point north of the area within which vehicles travelling on Bernal Heights and Folsom "may come in conflict." The evidence fixes the point of collision on respondent's portion of Folsom Street, anterior to the area of traffic conflict. To conceive of the area of conflict to be distended to the point where this collision occurred would be to disregard the normal flow of traffic and to transform it into a diverging path looping down into Folsom Street. The driver of a car proceeding from the east toward the west would be required to swerve abnormally from the east-west lane down into Folsom Street in order to reach the point of collision here. To return to the line of traffic the driver would then be compelled to make an abrupt left turn. We must agree with the trial court that the point of collision north of the normal east-west flow of Bernal Heights traffic cannot be contained within the code concept of an intersection and that the jury's finding is not substantiated by the evidence.

In the light of the above described function of the jury, *Moreno* v. *Hawbaker* (1958), 157 Cal.App.2d 627 [321 P.2d 538], sheds no light on the basic questions here. It does not adjudicate the issue of whether the court may set aside a verdict based upon an unsupportable concept of an intersection under section 86 of the Vehicle Code. The question in that case turned on whether the reading of the section, without a further descriptive instruction, "is incomprehensible when applied to an odd angled intersection with shoulders but no curbs on the intersecting streets, and where one street curves into the other." (P. 634.) Holding that "the reading of section 86 of the Vehicle Code . . . was all that was required," Justice Peters for the court points out that "[w]hat the area of conflict is" constitutes "a fact question." (P. 635.) That the determination of this issue in the instant case initially rested with the jury as a "fact question" cannot be doubted; the crucial point must be whether substantial evidence supported the jury's finding—a different matter entirely than that decided by Moreno.

The jury's determination of the fact question here finds no substantial support. Nor does appellant's contention that respondent himself testified that appellant was "in the intersection" at the point of collision save appellant. It is true that respondent said appellant "was in the intersection, right at the intersection at the crest of the hill," but this was when

respondent *first* saw appellant, not at the point of impact. According to respondent, appellant's path followed an angular course north of the officer's prolongation of the curb lines, which would, of course, carry appellant farther into Folsom.

We turn to appellant's second contention that the judgment cannot stand because the jury, in accordance with appropriate instructions, impliedly found respondent failed to avail himself of a last clear chance to avoid the accident.

Whether the doctrine of last clear chance should be applied here presents, as usual, a complex question. ▮▮▮ The doctrine obviously contemplates not the conceivable chance which a defendant may have to avoid an accident by action undertaken a split second or two sooner, but the clear chance of avoidance, which was available but neglected. In this case the question as to the applicability of the doctrine takes on added difficulty since the accident occurred in the approach to an intersection and happened within a second or two.

Although the doctrine of last clear chance has been expanded by the courts, it must nonetheless apply only when the defendant has failed to exercise a last and clear chance to avoid the accident. Commentators have suggested that in a complex industrial society in which "the accident toll of our modern way of life is large and inevitable" (Prof. Fleming James, Jr., *Practical Changes in the Field of Negligence,* 37 Mich. State Bar Jour. (1958), 10, 18), liability should not be dependent upon fault; that the law of negligence may revert to the earlier rules of strict liability; that, indeed, negligence itself was but an outgrowth of the strict law of trespass. One illustration of the trend, according to this analysis, lies in the "whittling down of contributory negligence" and "growing recognition of the last clear chance" doctrine. (P. 13.)

In further defining this trend, Harper and James tender the hypothesis that "people generally feel that only those to blame for an accident ought to be made to pay for it . . ." (2 Harper and James, The Law of Torts (1956), § 22.14, p. 1256); that "faults should be compared and recovery, somehow, roughly apportioned to them; that in this comparison one whose negligent operation of a dangerous vehicle has endangered others should fare worse than one whose carelessness has exposed only himself to peril." (*Id.*) The writers point out, however, that in this light the last clear chance doctrine is limited: "Where the peril must be a discovered one, that requirement does not derive from the logic actually

used but from a notion that it is not always a greater fault to disregard a later chance—it is not if the chance is merely theoretical, but only if it is actual, or 'clear.' " (*Ibid.*, p. 1257.) The recent California cases reflect this emphasis upon the requirement that the opportunity to avoid the accident must be actual and "clear."

Thus in *Kowalski* v. *Shell Chemical Corp.* (1960), 177 Cal. App.2d 528 [2 Cal.Rptr. 319], this court held the doctrine inapplicable to an intersection collision between a motorcyclist and a truck in which the plaintiff cyclist attempted to show by mathematical computation that defendant would necessarily have seen plaintiff before he entered the intersection although the evidence only indicated defendant *might* have seen plaintiff. After thoroughly reviewing the cases, Justice Bray points out, "To hold that the last clear chance was applicable here would mean that there could be no intersection collisions to which the doctrine would not apply. . . . Here it is clear that the accident was caused by the fact that because of the parked vehicles the motorcycle suddenly appeared in front of the oncoming car." The chance which must be afforded to avoid the accident must be "a clear chance" (p. 533), a chance that cannot be constructed by computing distances by the application of a formula of mathematical computation which "only showed that the defendant *could* have seen the plaintiff at an earlier time, not that the defendant must have seen the plaintiff at such an earlier time." (P. 535.)

The cases have held the doctrine inapplicable to create a last clear chance by a splitting of seconds. Thus, *Bagwill* v. *Pacific Electric Ry. Co.* (1928), 90 Cal.App. 114, 121 [265 P. 517], quoted in *Kowalski, supra* (1960), 177 Cal.App.2d 528, 534, points out, " 'Certainly the doctrine of last clear chance never meant a splitting of seconds when emergencies arise. . . .' " In *Rodabaugh* v. *Tekus* (1952), 39 Cal.2d 290 [246 P.2d 663], defendant at a distance of about 500 feet first observed decedent's car travelling at 35 to 40 miles an hour; decedent, ignoring a stop sign, proceeded into an intersection; defendant gently applied his brakes at about 75 to 100 feet from the intersection and then 35 feet from the intersection slammed on his brakes but was unable to avoid the collision. Despite the contention that defendant could have stopped his car at approximately 60 feet the court holds the doctrine not applicable " '. . . to the ordinary case in which the act creating the peril occurs practically simul-

taneously with the happening of the accident and in which neither party can fairly be said to have had a *last clear chance* thereafter to avoid the consequences. . . .' '' The very recent decision of the Supreme Court in *Hildebrand* v. *Los Angeles Junction Ry. Co.*, 53 Cal.2d 826 [3 Cal.Rptr. 313, 350 P.2d 65], holds the doctrine inapplicable to a collision between a motorcycle and a locomotive at a crossing, pointing out that the trainman did not have sufficient chance to give warning when the trainman had no reason to believe that plaintiff would be unable to stop and would collide with the train.

All of the evidence in the instant case indicates that the accident occurred within a second or two from the time that appellant first saw respondent's car. In answer to a question as to the lapse of time ''[f]rom the time you first saw . . . [respondent] until the accident was all over,'' appellant said, ''Probably was just a couple of seconds.'' Indeed, counsel asked appellant, ''Q. In any event there was not enough time to turn or to blow your horn or to apply your brake, it was all over literally in a second or two? A. Yes.'' In that interval respondent did not have time to depress the brake pedal before the impact occurred. To the question, ''Now after you first observed the motorcycle to the time the accident happened were you able to step on your brakes at all?'' Respondent answered, ''I took my foot off the accelerator, but by the time I just barely touched the pedal he shot in front of me and I didn't have time to depress it at all.'' The evidence indubitably shows the motorcycle crossed the area at great speed and within an extremely short period of time.

Applying the doctrine of the cited cases and the classic formula of *Brandelius* v. *City & County of San Francisco* (1957), 47 Cal.2d 729 [306 P.2d 432], to these facts, appellant's testimony as to the occurrence of the accident in a second or so and respondent's statement of inability to depress the brake pedal before the impact indicates that appellant failed to meet the third postulate of *Brandelius*: the last clear chance to avoid the accident by the exercise of ordinary care.

We have concluded the trial court did not err in granting the judgment notwithstanding the verdict, since the collision did not occur in an intersection as defined in the Vehicle Code. We do not believe the verdict can be sustained upon any asserted application of the last clear chance doctrine.

We affirm the judgment.

Bray, P. J., and Duniway, J., concurred.